983 F.2d 459
 60 Fair Empl.Prac.Cas. (BNA) 719,
60 Empl. Prac. Dec. P 41,950, 61 USLW 2395
 Carol KEENAN and Lawrence Gerrard and Ernest Gilbert and
Walter Smith and Daniel Rosenstein
v.
CITY OF PHILADELPHIA and Philadelphia Police Department and
Kevin Tucker and James Gallagher and Roy Stoner
and Robert Grasso and Victor Marcone and
Ralph J. Teti, Esquire,
Kevin Tucker, James Gallagher, Roy Stoner, City of
Philadelphia, Philadelphia Police Department and
Robert Grasso, Appellants.
 No. 91-1306.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 1, 1991.
Decided Dec. 17, 1992.
Sur Petition for Rehearing Jan. 21, 1993.
 
 Susan Shinkman (argued), City Solicitor of Philadelphia, Philadelphia, PA, for appellants.
 Richard A. Sprague (argued), Sprague & Sprague, Philadelphia, PA, for appellees.
 Before: BECKER, HUTCHINSON and HIGGINBOTHAM, Circuit Judges.
 A. LEON HIGGINBOTHAM, Jr., Circuit Judge.
 
 
 1
 In this appeal, defendants challenge the district court's March 19, 1991 order dismissing in part their motions for judgment notwithstanding the verdict and/or remittitur and/or new trial and challenge the amount of attorneys' fees and costs. The plaintiffs in this case alleged that their equal protection and free speech and association rights had been infringed upon and that they were unlawfully transferred from their posts in the Homicide Unit of the Philadelphia Police Department in violation of 42 U.S.C. § 1983. A jury awarded the plaintiffs $640,000 in compensatory damages and $1,800,000 in punitive damages. The plaintiffs accepted the district court's remittitur of the punitive damages award to $1,200,000. The district court entered a judgment against the defendants and awarded attorneys' fees and costs of $1,127,657.90.
 
 
 2
 We will affirm the compensatory damages award assessed against the individual defendants and the City of Philadelphia. We will affirm in part and reverse in part the punitive damages award. Finally, we will vacate the award of attorneys' fees and costs and remand the case to the district court for further proceedings consistent with this opinion.
 
 I. FACTS AND PROCEDURAL BACKGROUND
 
 3
 Our nation has committed itself, through its Constitution and through substantial civil rights legislation, to prohibit unlawful gender discrimination. Nonetheless, the facts of this case demonstrate that even within a city police department, this prohibition has been disregarded.
 
 
 4
 All five plaintiffs in this case worked in the Homicide Unit of the Philadelphia Police Department. Detective Carol Keenan (Keenan) began working in the Homicide Unit in June 1985. She became the regular partner of Detective Lawrence Gerrard (Gerrard) and also worked with another detective, Ernest Gilbert (Gilbert). All three worked under the supervision of Sergeant Daniel Rosenstein (Rosenstein). Detective Walter Smith (Smith) was a representative of the Fraternal Order of Police (FOP), the police union.
 
 
 5
 All four individual defendants held various positions in the command structure of the Philadelphia Police Department. In June 1986, Captain Robert Grasso (Grasso) assumed command of the Homicide Unit. Grasso's immediate superior was Inspector Roy Stoner (Stoner). In turn, Stoner's superior was Chief Inspector James Gallagher (Gallagher). At the apex of this chain of command, Gallagher's superior was the Police Commissioner, Kevin Tucker (Tucker).
 
 
 6
 Friction developed between Captain Grasso and Detective Keenan as Grasso closely monitored Keenan's activities. One of Keenan's colleagues, Rosenstein, testified that Grasso was like "a heat-seeking missile: He just seemed to be homed right at Carol [Keenan] and wouldn't get off unless he could find the heat."
 
 
 7
 As we detail more fully infra, Grasso discriminated against Keenan in several specific instances: he prevented her from going on overnight trips, from taking a witness protection detail, and from going on a transportation detail. Gerrard, Gilbert, Rosenstein, and Smith supported Keenan in her complaints against this discrimination. Stoner, Gallagher, and, to a lesser extent, Tucker all had knowledge of the situation in the Homicide Unit.
 
 
 8
 On June 5, 1987, Keenan, Gerrard, Gilbert, and Smith were transferred from the Homicide Unit to detective units around Philadelphia. Rosenstein, who was on special assignment away from the Homicide Unit from June 1987 to March 1988, was transferred out of the Homicide Unit to uniformed patrol upon his return on April 1, 1988. The transfers of Keenan, Gerrard, Gilbert, and Smith were initiated by Captain Grasso and signed and approved by Grasso, Inspector Stoner, Chief Inspector Gallagher, and Police Commissioner Tucker. Grasso initially recommended the transfer of Smith in November 1986 and of Gilbert and Gerrard in December 1986. He initially recommended the transfers for Keenan and Rosenstein on May 12, 1987. Grasso sent Police Commissioner Tucker memoranda with the transfer requests for Rosenstein, Keenan, Gerrard, Gilbert and Smith on May 15, 1987. The transfers were approved by Inspector Stoner on May 15, 1987 and by Chief Inspector Gallagher on May 18, 1987. Police Commissioner Tucker approved the transfers at some later point.
 
 
 9
 After the transfers, in March 1988, the Internal Affairs Division (IAD) of the Philadelphia Police Department conducted investigations of Keenan, Gerrard, Gilbert, and Smith on the basis of anonymous letters. We note for the record that evidence was presented that these investigations were selective and in retaliation for plaintiffs' formal complaints challenging their transfers.[1]
 
 
 10
 On September 15, 1988, Keenan, Gerrard, Gilbert, Smith, and Rosenstein filed a complaint in district court naming as defendants the City of Philadelphia, Tucker, Gallagher, Stoner, Grasso, Lieutenant Victor Marcone (Marcone), and Deputy City Solicitor Ralph Teti (Teti). Plaintiffs alleged in their complaint that defendants had acted to discriminate and retaliate against them. On March 3, 1989, the district court dismissed the complaint as to defendants Marcone and Teti.
 
 
 11
 The matter went to trial on November 22, 1989. On January 16, 1990, the jury returned a verdict in favor of plaintiffs, assessing $2.44 million in damages: $640,000 in compensatory damages and $1,800,000 in punitive damages.[2] All defendants were liable for the compensatory damages and all but the City of Philadelphia were assessed punitive damages.[3] On March 19, 1991, the district court denied defendants' motions for a new trial and for judgment n.o.v. but granted a remittitur of one third of the punitive damages.[4] The district court also awarded plaintiffs attorneys fees and costs of $1,127,657.90. Plaintiffs accepted the punitive damages award as remitted. Defendants filed their timely appeal on April 18, 1991. The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343. We have jurisdiction under 28 U.S.C. § 1291.
 
 II. LIABILITY
 
 12
 Defendants present several issues on appeal. While we have considered them all,[5] we will address in this section whether the evidence was sufficient to support the equal protection and First Amendment claims, whether municipal liability was proper, and whether prejudicial error was committed by the trial judge in his comments on the witnesses and the evidence. We affirm the district court on these issues.
 
 A. Sufficiency of Evidence[6]
 
 13
 The standard of review of a denial of a motion for judgment n.o.v. on a sufficiency of evidence argument is limited. " 'Because a jury determined the issue, our scope of review is limited to examining whether there is sufficient evidence to support the verdict, drawing all reasonable inferences in favor of the verdict winner.' " Kelly v. Matlack, 903 F.2d 978, 981 (3d Cir.1990) (quoting Blum v. Witco Chemical Corp., 829 F.2d 367, 372 (3d Cir.1987)). Denial of the motion must be affirmed "unless the record is 'critically deficient of that minimum of evidence from which the jury might reasonably afford relief.' " Link v. Mercedes-Benz, 788 F.2d 918, 921 (3d Cir.1986) (citation omitted).
 
 1. Equal Protection
 As we have recently stated:
 
 14
 To bring a successful claim under 42 U.S.C. § 1983 for a denial of equal protection, plaintiffs must prove the existence of purposeful discrimination. They must demonstrate that they "receiv[ed] different treatment from that received by other individuals similarly situated." Specifically to prove sexual discrimination, a plaintiff must show that any disparate treatment was based upon her gender.
 
 
 15
 Andrews v. Philadelphia, 895 F.2d 1469, 1478 (3d Cir.1990) (citations omitted).
 
 
 16
 There is easily sufficient evidence in the record for a reasonable jury to have concluded that Captain Grasso treated Keenan differently from other individuals similarly situated and did so based upon her gender.[7] As the following incidents amply demonstrate, Grasso discriminated against Keenan in his running of the affairs of the Homicide Unit.
 
 
 17
 In August 1986, Rosenstein originally assigned Gerrard and Keenan to protect and debrief a female witness. The assignment entailed overnight protection in a hotel. Rosenstein made the assignment on the basis of Gerrard's expertise in the field of the investigation and on the basis of Keenan's skill in interviewing and the rapport she had previously developed with the witness to be protected and debriefed. However, Grasso refused to allow Keenan to go on this overnight witness protection detail because "she's got a child at home." Keenan had no child, although an eighteen-year-old foreign exchange student and Keenan's adult cousin were living with Keenan at the time. Grasso replaced Keenan with a male detective, Frank O'Brien, who had three minor children at home. The other male detective on the assignment, Gerrard, had four minor children at home.
 
 
 18
 In November 1986, Grasso refused to allow Keenan and Gerrard to go on a trip to Atlantic City to retrieve a murder weapon and talk to a witness who had been identified as possessing important knowledge in an on-going investigation. Grasso instead ordered that Keenan and Gerrard telephone the witness in Atlantic City and request that she come to Philadelphia on a bus and bring the murder weapon with her. Rosenstein asked Grasso to rethink the order, but Grasso stood by his order.
 
 
 19
 On December 5, 1986, Grasso gave Rosenstein permission to bring in "a couple of detectives" on a Saturday to question an informant who had information that could potentially resolve several unsolved murder cases. Rosenstein arranged that Gilbert and Keenan would come in to conduct the interview. Grasso came into the office that day. When Grasso saw that Keenan was there, he called Rosenstein into his office and asked "[W]hat's she doing here?" When Rosenstein explained, Grasso responded that he had meant that only Rosenstein and one detective should have been assisting with the informant. Later, Grasso told Rosenstein "send her home" or "send Keenan home." Grasso did not suggest that Gilbert be sent home.
 
 
 20
 In March 1987, Keenan, Gilbert, and Gerrard were served with court notices, requesting their presence at trial the next day. Grasso brought Rosenstein and Lieutenant Gibbons, another of Keenan's superiors, into his office. When Rosenstein and Lieutenant Gibbons came out, they handed signed notices to Gilbert and Gerrard allowing them to go, but Lieutenant Gibbons informed Keenan that he did not yet know whether Keenan was approved to go or not. Grasso had instructed that he, Grasso, be telephoned at 10 p.m. that day at which time he would make the decision. When Keenan questioned Rosenstein and Lieutenant Gibbons and asked why "it was always me," Grasso came over and said: "Sounds to me like somebody here has something to say." When Keenan then asked Grasso for a decision on the court notice regardless of which way the decision was to go, Grasso pointed his finger at Keenan, said: "You've got a problem," and left the room. Keenan interpreted this comment as a threat that Grasso was going to do something to her.
 
 
 21
 In a final incident, Grasso's action and language further demonstrated that he treated Keenan differently on account of her gender.[8] On May 12, 1987, Grasso prohibited Keenan from transporting a male cooperating prisoner from a prison to the District Attorney's office in Philadelphia for the purpose of interviewing and debriefing the prisoner. Rosenstein wanted to assign Keenan and Gerrard to the task, because both were familiar with the cooperating prisoner, were trusted by the prisoner, were familiar with the case, and were capable interviewers. After Rosenstein had explained this to Grasso, Grasso had no problem with Gerrard but did not want Keenan to participate. When Rosenstein asked: "Why not Keenan?," Grasso stated: "Well, this is no job for a woman." Grasso stated that he wanted two men to perform the detail. When Gerrard spoke with Grasso by phone, asking: "Captain, are you saying she can't go because she is a girl?," Grasso responded that he would rather have a male detective. Rosenstein found a man to go on the detail with Gerrard.
 
 
 22
 These incidents provide sufficient evidence in the record for a jury to have found purposeful discrimination by Grasso against Keenan based upon her gender.
 
 2. Free Speech and Association
 
 23
 To succeed on a § 1983 claim on the basis of free speech or association, plaintiffs must show that the protected activity engaged in was a substantial or motivating factor in the decision to take adverse action against them. Laskaris v. Thornburgh, 733 F.2d 260, 264 (3d Cir.1984). Plaintiffs must "produce evidence sufficient to show that the defendants know [of their protected activity]." Laskaris, 733 F.2d at 265. For supervisors, liability can be established in two ways: (1) "through allegations of personal direction or of actual knowledge and acquiescence," or (2) through proof of direct discrimination by the supervisor. Andrews v. Philadelphia, 895 F.2d 1469, 1478 (3d Cir.1990) (quoting and citing Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir.1988)).
 
 
 24
 There is sufficient evidence in the record for a reasonable jury to have concluded that the plaintiffs' engagement in protected activity was a substantial or motivating factor in the decision by the defendants to take adverse action against them. Evidence was presented that, by associating with and speaking out on behalf of Keenan, plaintiffs Gerrard, Gilbert, Rosenstein, and Smith each engaged in protected activity. Keenan herself also exercised her free speech and association rights.
 
 
 25
 Evidence was also presented that each of the defendants took actions that adversely impacted on the plaintiffs. Inspector Stoner approved each transfer request made and forwarded by Captain Grasso without asking for reasons. Chief Inspector Gallagher and Police Commissioner Tucker also approved the plaintiffs' transfers without asking why the transfers were necessary.
 
 
 26
 The remaining question is that of knowledge on the part of the defendants. Considering the first three individual defendants, we believe there was sufficient evidence for a jury to find, with reasonable inferences, that Grasso, Stoner, and Gallagher each knew of the plaintiffs' engagement in protected activity before May 15, 1987, the date that Grasso forwarded the transfer requests to Stoner and the date that Stoner approved them.
 
 
 27
 The events occurring from March 1987 to June 1987 demonstrate this knowledge. On March 25, 1987, after the incident involving Grasso's delayed approval of the court notice requesting her to appear in court, Keenan met with Grasso's superior, Inspector Stoner. Keenan explained to him some of the incidents that had occurred to that point. Keenan informed Stoner that she believed, after working with Grasso for nine months, that Grasso hated her. When Stoner asked why, Keenan said that she did not know. Keenan did not want Stoner to take any action but was apprising him of the situation so that if Grasso did anything, Stoner would be in a position to make an informed decision. She informed Stoner that Rosenstein, Gerrard, and Gilbert would support her as witnesses.
 
 
 28
 After Grasso prohibited Keenan from participating in the transportation of the male cooperating prisoner on May 12, 1987, Keenan met with Stoner again on May 13, 1987. As we set forth more fully infra, Keenan again gave Stoner the details of Grasso's treatment of her but was told in response that her complaint could not be classified as one of sex discrimination. On the same day as the meeting between Keenan and Inspector Stoner, Stoner met with his superior, Chief Inspector Gallagher. Stoner advised Gallagher about the problem involving Keenan.
 
 
 29
 After Keenan had met with Stoner on May 13, 1987, Keenan spoke with Smith, the representative of the FOP, the police union. Smith explained to Keenan "what [her] rights were, as far as filing a grievance and as far as sexual discrimination and what can be done about this, what the FOP can do...." Smith allowed Keenan to make her own decision about filing a grievance, but he advised her to seek the advice of FOP counsel and to speak to Ken Rocks (Rocks), FOP vice president and legislative representative. During this conversation, Keenan and Smith were in Smith's office in the Homicide Unit, an office about five to ten feet away from Grasso's office which is set off from the rest of the area by a small plywood partition with a door. Grasso, sitting in his office, appeared to be intent on overhearing the conversation between Keenan and Smith.
 
 
 30
 Moreover, we believe there was sufficient evidence presented for a jury to find, with reasonable inferences, that Tucker knew of the actions of his subordinates. Two pieces of evidence support Tucker's knowledge.
 
 
 31
 First, FOP President Robert Hurst (Hurst) testified that on May 19, 1987 he discussed "the Carol Keenan case" with Police Commissioner Tucker. Hurst had met with Keenan after her second meeting with Stoner on May 14, 1987. Keenan told Hurst of several of the incidents involving Grasso and asked Hurst to intercede on her behalf with Tucker. Hurst agreed. At Hurst's request, Keenan prepared a handwritten memo putting her complaints in writing. Keenan delivered this memorandum to Hurst on May 18, 1987. At this point, Hurst suggested to Keenan that he meet with Chief Inspector Gallagher, rather than Commissioner Tucker, and Keenan agreed. At a regularly scheduled meeting with Tucker on May 19, 1987, Hurst nonetheless discussed "the Carol Keenan case" with Tucker. Hurst did not bring the complaint formally and did not reduce it to writing. Hurst did tell Tucker that he was going to discuss it further with Chief Inspector Gallagher after the meeting, to which Tucker responded "Good, you do that."[9]
 
 
 32
 Second, Anthony Molloy, an attorney representing the FOP, testified that at a first-step grievance meeting in late June 1987 which he, Tucker, and Rocks attended, "the police commissioner stated that at the time that he had approved the transfer ... that he had been fully aware of the actions of his subordinate command personnel in this particular case, and that he agreed with the actions taken by his commanders." According to Molloy's testimony, Tucker, in discussing the transfer, stated that he had difficulty with a female detective being assigned to transport a male prisoner. Molloy's account of the June conversation was also supported by testimony given at an earlier arbitration hearing by FOP official Rocks, testimony which was read into evidence at the trial and affirmed by Rocks. While liability does not flow solely from Tucker's endorsement of Grasso's procedure, Tucker's discussion of this practice does demonstrate his knowledge of the situation in Homicide Division.
 
 
 33
 This case is not one where the transmission of knowledge regarding each of the individual plaintiffs' particular activities through the police department's chain of command has been precisely set forth. Nonetheless, the above evidence demonstrates that each defendant did learn specifically of "the Carol Keenan case," the situation that involved Detective Keenan and Captain Grasso. It is reasonable to infer that knowledge of the activities of her co-workers, the male plaintiffs, was also passed along. With reasonable inferences drawn in favor of the plaintiffs, the evidence is sufficient to establish that the plaintiffs were impermissibly disciplined by defendants Grasso, Stoner, Gallagher, and Tucker for conduct that constituted protected activity.
 
 B. Municipal Liability
 
 34
 Read as a whole and with reasonable inferences in favor of the plaintiffs, there was also sufficient evidence for a reasonable jury to have found the City of Philadelphia liable for the constitutional violations committed by Grasso, Stoner, Gallagher, and Tucker.
 
 
 35
 To hold a municipality liable under § 1983, the Supreme Court has made clear that plaintiffs may not depend on the theory of respondeat superior but rather need to prove that the municipality supported the violation of the rights complained of. Monell v. Dept. of Social Services, 436 U.S. 658, 695, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978). The Court stated:
 
 
 36
 [I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.
 
 
 37
 Id. 436 U.S. at 695-97, 98 S.Ct. at 2037-38. The Supreme Court has also noted that "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." Pembaur v. Cincinnati, 475 U.S. 469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986); see also Bartholomew v. Fischl, 782 F.2d 1148, 1154 (3d Cir.1986) ("a 'single instance' of misconduct by a policymaking city official could provide the basis for an inference that an official policy existed").
 
 
 38
 In this case, the district court correctly determined that Police Commissioner Tucker was an official policymaker. In a previous case involving different facts, we also found that this same Philadelphia Police Commissioner was an official policymaker. See Andrews, 895 F.2d at 1481. As in Andrews, Tucker here "retained the authority to measure" the conduct and decisions of his subordinates, Grasso, Stoner, and Gallagher.
 
 
 39
 Further, the evidence in this case shows that Tucker knowingly acquiesced to many of the actions of his subordinates. In the light of his knowledge, Tucker's approval of the transfer requests establishes municipal liability. We note that unlike Andrews, 895 F.2d at 1482, the jury's verdict finding Tucker personally liable in this case reinforces the determination of municipal liability.
 
 C. The District Court's Comments at Trial
 
 40
 The City complains that substantial prejudicial error was committed in the trial through the court's comments on the evidence and witnesses. At times, the trial judge may have made comments which would have been far better left unsaid.[10] In this case, we cannot conclude that the comments made rise to the level of reversible error. See In re Yagman, 796 F.2d 1165, 1178-80 (9th Cir.1986), cert. denied, 484 U.S. 963, 108 S.Ct. 450, 98 L.Ed.2d 390 (1987). "[A] certain amount of tension ... is not uncommon in emotional and hard-fought cases." Id. at 1178.
 
 III. COMPENSATORY DAMAGES
 
 41
 Our review over the scope of damages is a narrow one. We may grant a new trial or remittitur only if the verdict awarded by the district court is so grossly excessive as to shock the judicial conscience. Gumbs v. Pueblo Int'l Inc., 823 F.2d 768, 771 (3d Cir.1987).
 
 
 42
 The jury returned a verdict granting $640,000 in compensatory damages, finding against all five defendants. The jury awarded Keenan, $220,000; Smith, $175,000; Gilbert, $175,000; Rosenstein, $40,000; and Gerrard, $30,000.
 
 
 43
 Testimony regarding the compensable harm suffered by the plaintiffs was given by plaintiffs themselves, family members, friends, and neighbors, as well as two expert witnesses. Evidence showed "daily" harassment of Keenan. Beyond the lay testimony, Dr. Robert Sadoff, an expert witness, stated that each plaintiff suffered emotional stress related to the transfer out of the Homicide Unit. Keenan required continuing therapy. An actuary-economist, David Bunin, calculated plaintiffs' economic losses which alone exceeded the jury's compensatory awards for each plaintiff. Finally, the jury was presented with some evidence that detectives in the Homicide Unit routinely doubled their salaries through overtime. Cf. Perez v. Cucci, 725 F.Supp. 209, 256 (D.N.J.1989), aff'd 898 F.2d 142 (3d Cir.1990). Given our standard of review and the evidence produced at trial, we cannot conclude that the compensatory damages were so grossly excessive as to shock our judicial conscience.
 
 IV. PUNITIVE DAMAGES
 
 44
 We next consider the question of punitive damages.[11] We first determine that the conduct of three of the four defendants (Grasso, Stoner, and Gallagher) met the standards for the imposition of punitive damages, but that Tucker's conduct did not. Second, we decide that the punitive damages awards against Grasso, Stoner, and Gallagher, as remitted, were not excessive.
 
 
 45
 A. Did the Defendants' Conduct Rise to the Level Required for Imposition of Punitive Damages?
 
 
 46
 Punitive damages in § 1983 cases are available where the defendants have acted with a "reckless or callous disregard of, or indifference to, the rights and safety of others." Bennis v. Gable, 823 F.2d 723, 734 (3d Cir.1987) (quoting Smith v. Wade, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983)). However, "punitive damages in general represent a limited remedy, to be reserved for special circumstances." Savarese v. Agriss, 883 F.2d 1194, 1205 (3d Cir.1989) (citing Cochetti v. Desmond, 572 F.2d 102, 105-06 (3d Cir.1978)). "[D]espite its utility as a deterrent, the punitive damage remedy must be reserved, we think, for cases in which the defendant's conduct amounts to something more than a bare violation justifying compensatory damages or injunctive relief." Cochetti, 572 F.2d at 106.
 
 
 47
 We are fully satisfied that the standard of conduct necessary to impose punitive damages was met with respect to three of the defendants. As we have set out supra, the overwhelming evidence presented concerning Grasso's conduct demonstrated that his is clearly a case where the imposition of punitive damages is warranted.
 
 
 48
 While the question is closer, we also believe the evidence also supports the imposition of punitive damages at the next two levels of the command structure. In this case, the conduct of Stoner and Gallagher exhibited a reckless or callous disregard of or indifference to the rights of Keenan and the other plaintiffs.
 
 
 49
 With respect to Stoner, evidence was presented at trial that he approved each transfer request made by Grasso without asking for reasons even though he knew of Keenan's allegations concerning Grasso and of the male plaintiffs' support for Keenan's claims. Stoner gave his approval to the transfer requests despite his explicit assurance to Keenan, made when she came to see him on March 25, 1987, that "there is nothing that man [Grasso] can come in and say to me [Stoner] that I wouldn't realize that something was wrong and I would ask you before I made any decision on any action he requested."
 
 
 50
 Moreover, even after two meetings with Keenan, Stoner refused to address the problem he acknowledged in any way whatsoever. At her first meeting with Stoner, Keenan had not asked Stoner to take any action. Rather, she met with him to let him "know what is going on and [to hear] both sides of the stor[y]." When Keenan had her second meeting with Stoner on May 13, 1987, she told Stoner about her feeling of "having no job left" because of the limits placed on her assignments and about Grasso's refusal to allow her to transport a male prisoner. At this meeting, Keenan requested then asked that Stoner talk to Grasso and tell him that he [Grasso] was not permitted to limit her assignments on account of her sex. Stoner told Keenan that Stoner felt that Grasso's action with respect to the transportation detail was proper and that because of this he could not talk to Grasso. Stoner asked whether Keenan's complaint was under the heading of sex discrimination. Keenan replied yes. Stoner then asked "Well, did he grab you, did he touch your body in any way?" Keenan said "No." Stoner continued: "Did he ever ask you to sleep with him?" Keenan again said "No." Stoner then said, "That's what sex discrimination means. Sex discrimination doesn't mean anything else but that." When Keenan persisted with her complaint that she was facing sex discrimination and raised a hypothetical example about Black detectives being forbidden to transport white prisoners, Stoner said that the situations were not the same. Stoner repeated that he could not intercede because he [Stoner] did not feel that Grasso's actions amounted to sex discrimination. When Stoner met Gallagher later the day of the second meeting, he told Gallagher that "Carol Keenan had a problem, I took care of it."
 
 
 51
 Needless to say, the law prohibiting sex discrimination does indeed mean more than the proposition that Grasso was not free to "grab" Keenan or "touch [her] in any way." But as importantly for the imposition of punitive damages in this case, we note that Stoner refused to intercede in any way with Grasso even after having been alerted to this situation by Keenan nearly two months before. Faced with what he acknowledged was a "problem," his way of taking care of it was to refuse to speak with one of the parties (Grasso) and to repeatedly tell the other (Keenan) that her complaint was baseless. Stoner's actions avoided dealing with an acknowledged problem and made his liability for punitive damages an appropriate question for the jury.
 
 
 52
 The situation is much the same with defendant Gallagher. Knowing the specifics of the Keenan problem, Gallagher also approved Grasso's requests to transfer the plaintiffs without making any inquiries or asking why the transfers were necessary. Moreover, we also note that Detective Checchia, a member of the Homicide Unit, testified that in July of 1987, Gallagher said that Keenan had become a prima donna and that "she wanted to do things that men should be doing, transporting male prisoners, going on overnight trips."
 
 
 53
 The evidence with respect to the character of Police Commissioner Tucker's action is, however, significantly weaker. See discussion supra. As related by a lawyer in the firm representing the police union, the police commissioner stated that at the time he had approved the transfers, "he had been fully aware of the actions of his subordinate command personnel in this particular case, and that he had agreed with the actions taken by his commanders." Further, evidence was presented that Tucker stated that he had difficulty with a female detective being assigned to transport a male prisoner.
 
 
 54
 Even taken at face value as related by the police union's lawyer, we think these statements amount to little more than a general acknowledgement that a problem occurred on the police commissioner's watch. While we have determined that there is sufficient evidence to support a finding of municipal and individual liability, these statements cannot justify the imposition of punitive damages. First, Tucker merely acknowledged his position of responsibility. While Stoner and Gallagher's actions flew directly in the face of Keenan's first or second-hand protestations, Tucker was at the apex of the chain of command. The command staff of this police department numbered close to two hundred officers. And while the second statement attributed to Tucker does show his general knowledge of the situation in Homicide Divison, we are not prepared to equate Tucker's statement of difficulty with the assignment of a female detective to transport a male prisoner with a showing sufficient to find that Tucker's conduct rose to the level of punitive damages. To allow the imposition of punitive damages for the mere expression of doubt or difficulty about an abstract or hypothetical situation, even where that hypothetical is ultimately derived from the facts of an actual situation, would simply cast the net too wide. Due to their lack of specificity, Tucker's comments do not exhibit a reckless or callous disregard of or indifference to the rights of the plaintiffs.
 
 
 55
 Based on the foregoing, we will affirm the district court on the liability for punitive damages awards of defendants Grasso, Stoner and Gallagher but will reverse the district court on the question of Tucker's liability for punitive damages.
 
 
 56
 B. Were the Punitive Damages Awarded Excessive?
 
 
 57
 The majority of the panel believes that defendants waived any argument that evidence of their financial status is a prerequisite to punitive damages. Defendants challenged the excessiveness of the punitive damages award by arguing that it was disproportionate to other awards in similar cases. Nowhere in their submissions to the district court (or to this court before oral argument) did they argue that evidence of their financial condition is a prerequisite to a punitive damages award. In the majority's view, the crucial question regarding waiver is whether defendants presented the argument with sufficient specificity to alert the district court. The majority thinks they failed to do. Nor would they rely upon our discretionary power to consider an issue not raised. While the majority agrees with the comments of the dissenting colleague regarding the importance of the issue, they think that factor cuts the other way. The importance of the issue could be considered as a factor that counsels caution, rather than as a reason to resolve it in the absence of adequate briefing. Therefore, the majority does not reach the question on the merits.[12]
 
 
 58
 We next must determine whether these punitive damages can stand under our standard of review for excessiveness. The Third Circuit standard of review here has been recently stated: "[O]ur review of this question is severely limited: we may ... reverse and grant a new trial 'only if the verdict is so grossly excessive as to shock the judicial conscience.' " Gumbs v. Pueblo Int'l Inc., 823 F.2d 768, 771 (3d Cir.1987) (citations omitted). Where the district judge has granted a remittitur, deference to the trial court is heightened. "[O]ur review requires additional deference to the district court since it already granted a remittitur." Gumbs, 823 F.2d at 771; Spence v. Board of Education, 806 F.2d 1198, 1201 (3d Cir.1986).
 
 
 59
 After the jury's verdict, the total punitive damages award was $1,800,000 spread over four individuals. After the trial court's remittitur, the award was reduced to $1,200,000 spread over four individuals: Grasso was assessed $266,666.65, Gallagher was assessed $266,666.65, Stoner was assessed $133,333.35, and Tucker was assessed $533,333.35. Since we have concluded that no punitive damages should have been imposed in Tucker's case, we consider only the awards of Grasso, Stoner, and Gallagher.
 
 
 60
 We do not find that these awards, as remitted and spread over four individuals, so grossly excessive as to shock our judicial conscience. We will uphold the punitive damages awards against Grasso, Stoner, and Gallagher.
 
 V. ATTORNEYS' FEES
 
 61
 Review of the reasonableness of an award of attorney's fees is under an abuse of discretion standard. Rode v. Dellarciprete, 892 F.2d 1177, 1183 (3d Cir.1990). Whether the district court applied the proper standards or procedures is a question of law subject to plenary review. Id. The district court's factual findings are reviewed under a clearly erroneous standard. Id. at 1182-83.
 
 A. The Lodestar's Number of Hours
 1. Specificity of the Hours Claimed
 
 62
 Any hours to be used in calculating attorneys' fees must be detailed with sufficient specificity. The standards of specificity were met by the bulk of the plaintiffs' submissions, although not by the submissions of Mr. Richard Sprague.
 
 
 63
 While the Supreme Court has not described the standards for specificity in detail, the Court has stated "[c]ontemporaneously recorded time sheets are the preferred practice." Webb v. County Board of Education, 471 U.S. 234, 238 n. 6, 105 S.Ct. 1923, 1926 n. 6, 85 L.Ed.2d 233 (1985). At least one circuit strictly requires contemporaneous records.[13] According to the Court of Appeals for the D.C. Circuit:
 
 
 64
 Casual after-the-fact estimates of time expended on a case are insufficient to support an award of attorneys' fees. Attorneys who anticipate making a fee application must maintain contemporaneous, complete and standardized time records which accurately reflect the work done by each attorney.
 
 
 65
 National Ass'n of Concerned Veterans v. Secretary of Defense, 675 F.2d 1319, 1327 (D.C.Cir.1982).
 
 
 66
 A panel of this court has articulated the standard used in this circuit in the course of overturning a district court's conclusion that an attorneys' submissions lacked the requisite specificity. Rode, 892 F.2d at 1190-91. In Rode, the Third Circuit stated that "[a] fee petition is required to be specific enough to allow the district court 'to determine if the hours claimed are unreasonable for the work performed.' " (Rode, 892 F.2d at 1190 (quoting Pawlak v. Greenawalt, 713 F.2d 972, 978 (3d Cir.1983))). A fee petition should include "some fairly definite information as to the hours devoted to various general activities, e.g. pretrial discovery, settlement negotiations, and the hours spent by various classes of attorneys, e.g., senior partners, junior partners, associates." However, "it is not necessary to know the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney." Rode, 892 F.2d at 1190 (quoting Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp., 487 F.2d 161, 167 (3d Cir.1973)). We found sufficient specificity where the computer-generated time sheet provided "the date the activity took place." Id. at 1191.
 
 
 67
 Some of the assertions made by plaintiffs' counsel clearly misread the process of documenting a fee petition. The burden is on the party filing a fee petition to establish that the rate claimed is reasonable. Hensley v. Eckerhart, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). Suggestions that defense counsel "need only consult their own files" to ascertain the nature of the work being performed at any point in time and that the individual time records were available to the Court for in camera review "immediately upon request" are misleading in view of the burden placed on the plaintiff.
 
 
 68
 In this case, the trial court found the two computer-generated summaries of time spent by each attorney and paralegal that were provided met the standards of Rode. With one exception (the monthly summaries for twenty-five months of Richard Sprague's (Sprague) activities), these summaries showed the daily activities of each attorney and paralegal. One summary gave in chronological order the date, the time consumed, and a general description of the activities provided by each lawyer. The other summarized the counsels' time spent in various general activities such as arbitration, pretrial preparation, and trial. We agree with the district court's conclusion that the bulk of the plaintiffs' submissions met the standards of specificity.
 
 
 69
 However, a major portion of the plaintiffs' fee petition is not sufficiently specific. This is the portion relating to Sprague's hours from September 1987 to October 1989. For these months, the plaintiffs submitted only monthly cumulative totals of Sprague's hours,[14] claiming a total of 631.5 hours.[15] Faced with these monthly summaries, the trial court could only have speculated as to whether the hours claimed were reasonable for the work performed. Although the submissions relating to Sprague's hours do not presently meet our standards for specificity, the district court is directed to afford the plaintiffs a further opportunity to adequately document these submissions.
 
 2. The Subject Matter of the Hours Claimed
 
 70
 In determining the number of hours to be used in calculating the attorneys' fees, the district court deducted from the petition the hours plaintiffs' attorneys spent on their unsuccessful attempt to intervene in United States v. Philadelphia, 499 F.Supp. 1196 (E.D.Pa.1980) (the Brace Case). However, the district court did not deduct the hours spent on preparation, litigation, and appeal of a labor arbitration hearing concerning plaintiffs Keenan, Gerrard and Gilbert that preceded this case.
 
 
 71
 The City argues that to grant any attorneys' fees in respect of the time spent on the labor arbitration proceeding is an abuse of discretion. Their theory is that the arbitration hearing was an optional internal administrative proceeding and that to compensate plaintiffs' counsel for time spent on that hearing falls short of the standard enunciated by the Supreme Court in Webb v. County Board of Educ., 471 U.S. 234, 243, 105 S.Ct. 1923, 1928, 85 L.Ed.2d 233 (1985). We do not agree.
 
 
 72
 As interpreted in Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 561, 106 S.Ct. 3088, 3096, 92 L.Ed.2d 439 (1986) (Delaware I ), Webb means that "for the time spent pursuing optional administrative proceedings properly to be included in the calculation of a reasonable attorney's fee, the work must be 'useful and of a type ordinarily necessary' to secure the final result obtained form the litigation." Significantly, Delaware I also noted that "[a]pplication of this standard is left to the discretion of the trial court." Id.
 
 
 73
 In this case, the district judge specifically found that "[t]ranscripts of arbitration testimony were used at trial and served the purpose of discovery in this case. Further, the arbitrator's decision ... was read to the jury and constituted favorable evidence for the plaintiffs at trial." The judge found that the time spent on the arbitration matter was "inextricably linked to the issues before [the district court]." We find no abuse of discretion in the district court's inclusion of time spent in relation to the labor arbitration.[16]
 
 B. The Lodestar's Hourly Rate
 1. Fee Structure
 
 74
 Plaintiffs' counsel, the law firm of Sprague, Higgins, Creamer & Sprague, is a for-profit law firm. It does not set its fees "artificially low to serve the public interest." Student Public Interest Research Group v. A.T. & T. Bell Laboratories, 842 F.2d 1436, 1443 (3d Cir.1988). As part of its normal billing practices, it allows its clients to choose between two different billing methods. In one method, the uniform hourly rate, a client chooses to pay a single across-the-board hourly rate for every attorney in the firm who works on the client's case. In the other method, individualized hourly rates, a client chooses to pay separate rates for each attorney who works on the client's case. The law firm's clients most often choose the uniform billing method. According to plaintiffs' counsel, its "usual hourly rate" is the "fixed across-the-board rate [which] is the customary preference of clients."
 
 
 75
 In its discussion of the reasonable hourly rate to use in calculating the "lodestar," the district court had to decide whether to adopt the individualized billing method or the uniform billing method. Under the individualized rates, the award for counsel fees and the fee petition was $1,104,157.50. Under the uniform billing rate (at plaintiffs' proposed figure of $200/hour), the award for counsel fees and the fee petition would have been $978,985.00, a difference of $125,172.50.
 
 
 76
 The district court decided to use individualized rates and stated:
 
 
 77
 The law governing attorney fee compensation under 42 U.S.C. § 1988 does not permit me to determine an attorney's hourly rate by selecting between a firm's various billing methods, but rather, I must go by the prevailing market rate of compensation for each attorney. An attorney's rate should reflect an individual's experience and responsibility, as well as the economic reality that various activities have different rates of reasonable compensation. Thus, I shall not use plaintiffs' uniform hourly rates, rather, I shall award their individual hourly rates.
 
 
 78
 The district court was, of course, correct to state that the market rate of compensation must determine the appropriate hourly rate for computing the lodestar. However, we conclude that § 1988 does not preclude use of a uniform billing method where such a billing method produces market rates of compensation. First, our prior caselaw has recognized that billing rates are usually reflective of market rates. "The value of an attorney's time generally is reflected in his normal billing rate." Lindy Bros. Builders, Inc. v. American Radiator and Standard Sanitary Corp., 487 F.2d 161, 167 (3d Cir.1973). Second, we recognize that it is important not to tie the hands of the district court and is likewise important to opt, consistent with § 1988's purposes, for simple, easily-administrable schemes. Thus, where a district court is faced with a choice between two market rates of compensation based upon two normally used billing methods, one using uniform hourly rates and one using individualized hourly rates, we interpret § 1988 to place that choice initially within the lower court's discretion.
 
 
 79
 In this case, both of the firm's billing methods produced rates of compensation which were themselves market rates, at least on the plaintiffs' version of the facts regarding prevailing market rates. Both the uniform and the individualized were evidently accepted by the firm's clients in the market for legal services. The district court therefore erred in interpreting § 1988 to assume, as a matter of law, that a rate of compensation based upon a uniform hourly rate could not be reflective of market rates. We emphasize that this case does not involve a not-for profit law firm seeking market rates for its services.
 
 
 80
 Having decided that the law prevented use of one billing method, the district court did not choose between the two market rates of compensation. Since we disagree with the district court's conclusion that the law prevented the use of the uniform hourly rate, we must remand for the trial judge to make a choice between the uniform and the individualized hourly rates, but we do not suggest that it would be an abuse of discretion if the court used as its standard the uniform hourly rate.
 
 2. The Appropriate Hourly Rate
 
 81
 Whether the district court chooses the uniform hourly rate or the individualized hourly rates on remand, there will be an existing dispute to resolve as to what the exact rate(s) should be.
 
 
 82
 With respect to the uniform hourly rate, while plaintiffs' counsel offered an affidavit stating that his firm's usual hourly rate was $200/hour, defendants offered counter evidence of the across-the-board rate at which the Sprague firm charged its clients. This evidence consisted of a Feb. 15, 1987 bill for professional services rendered by the Sprague firm. According to this evidence, the across-the-board hourly rate charged by the Sprague firm is $150/hour. While this billing was several months before the July 8, 1987 retaining of plaintiffs' counsel, there nonetheless would appear to be a disputed question as to the hourly rate charged by the plaintiffs' counsel during this litigation.
 
 
 83
 With respect to the individualized hourly rates, the plaintiffs conducted a telephone survey of eleven attorneys in the local area which supported their petition and, in a supplemental petition, submitted an affidavit which provided some guidance to the district court. The City offered counter evidence of lower hourly rates which it claimed were the true market rates and argues that the plaintiffs failed to substantiate their individualized hourly rates. The district court evaluated the defendants' counter-evidence on market rates but rejected it. In part, the counter-evidence was rejected because it did not consider each individual attorney's experience. In part, the district court rejected the counter-evidence because it addressed the market rate of 1989 not of 1990. The district court apparently reasoned, in part, that since it had chosen to award current hourly rates as an adjustment for delay, the counter-evidence providing information regarding 1989 hourly rates, not 1990 hourly rates, was irrelevant because only the 1990 hourly rates were current. However, as we explain in more detail in the next section, adjusting the lodestar to account for any delay in payment is a separate exercise from the initial calculation of the lodestar. If it should choose the route of individualized hourly rates, the district court will thus need to reconsider its evaluation of the City's counter-evidence upon remand.
 
 
 84
 C. The Adjustment for Delay in Payment and the Choice of Historical or Current Rates
 
 
 85
 Upon remand, the district court will need to decide again whether or not to grant an adjustment to the lodestar for delay. To emphasize that the district court should approach this question as a separate inquiry from the lodestar calculation, we address the issue here.
 
 
 86
 In appropriate cases, the lodestar ought to be adjusted to account for the incurred costs of the delay plaintiffs' counsel has undergone in receiving payment. The Supreme Court in Missouri v. Jenkins, 491 U.S. 274, 284, 109 S.Ct. 2463, 2469, 105 L.Ed.2d 229 (1989), stated that "an appropriate adjustment for delay in payment--whether by the application of current rather than historic hourly rates or otherwise--is within the contemplation of [§ 1988]." This Circuit has noted that in granting plaintiffs compensation for delay, two methods may be used: basing the fee award on current rates or adjusting the fee based on historical rates to reflect its present value. Blum v. Witco Chemical Corp., 888 F.2d 975, 984 (3d Cir.1989) (Blum II ). Blum II noted that while the Third Circuit opinions have followed the latter approach,[17] the former is not ruled out in appropriate cases.[18] Blum II, 888 F.2d at 984.
 
 
 87
 Significantly, the cases in this circuit have placed "the burden on plaintiffs to document the need for a [delay] multiplier." Student Public Interest Research Group v. A.T. & T. Bell Laboratories, 842 F.2d 1436, 1453 (3d Cir.1988) (SPIRG ) (quoting Institutionalized Juveniles, 758 F.2d at 923-24). This evidence should document the costs of receiving delayed payment of fees. We have previously relied on this analysis to uphold a district court's order denying plaintiffs counsel compensation for delay where the evidence advanced by the plaintiffs was a mere three-sentence assertion of need. SPIRG, 842 F.2d at 1454. We have upheld a lower court's grant of compensation for delay in view of evidence which was placed before the district court of (1) market interest rates and (2) certification of law firms loans and interest payments paid on those loans while the law firm awaited payment of the fee in the case. Blum II, 888 F.2d at 984-85.
 
 
 88
 Upon remand, plaintiffs' counsel will need to meet this burden.
 
 
 89
 We thus reverse the district court's order denying the defendants' motion for judgment n.o.v. insofar as it relates to the punitive damages award against Kevin Tucker, vacate the order insofar as it awards plaintiffs' counsel attorneys' fees and costs, affirm the district court's order in all other respects, and remand this case to the district court for proceedings consistent with this opinion.
 
 
 90
 A. LEON HIGGINBOTHAM, Jr., Circuit Judge, dissenting in part,
 
 
 91
 I join in the opinion of the court as to all issues except the imposition of punitive damages. More particularly, I agree with Part IV A of the above opinion that the conduct of Grasso, Stoner, and Gallagher establishes their liability for punitive damages. I further agree that there is no basis for punitive damages against Tucker. However, I dissent because the extraordinary magnitude of the punitive damages in this case cannot be sustained on this record which is devoid of evidence of the defendants' financial net worth.
 
 
 92
 Although the majority feels that the issue is waived, I write separately to consider the question of the necessity of evidence of the individual defendant's net worth to sustain the imposition of punitive damages in the context of municipal liability for those punitive damages awards. I do not believe that this issue was waived and would consider this issue upon appeal exercising this court's discretionary power to raise the issue sua sponte. Loretangeli v. Critelli, 853 F.2d 186, 189 n. 5 (3d Cir.1988); Selected Risks Ins. Co. v. Bruno, 718 F.2d 67, 69 (3d Cir.1983). There are extraordinary circumstances in this case. The importance of the issue of defendants' economic worth, particularly in relation to the municipality's duty of indemnification, has been acknowledged by the District Court and by counsel for all parties. The issue involves substantial sums of taxpayers' money. When cities are not liable at all for punitive damages under 42 U.S.C. § 1983 and the Supreme Court's decision in Newport, this court must be extremely careful that we not inadvertently open a back door into the City's treasury when the Supreme Court has closed the front door. To treat this issue as having been waived, in all due respect, the majority sanctions a raid on the City's treasury--a raid by which only the plaintiffs and their lawyers unnecessarily benefit and from which the taxpayers needlessly suffer.
 
 
 93
 While I think we can decide this issue now as a panel, I recognize that if the panel is not resolute on this issue, this is a case which cries out for reconsideration in banc. But since I do not think that this matter should be deferred to some future day when a new wisdom will repudiate the ironic result the majority now sanctions, I will here first explain the illogic of such awards in general and then consider the evidence necessary to sustain their imposition.
 
 
 94
 A. The Logic and Illogic of Substantial Punitive Damages Awards and Municipal Liability
 
 
 95
 I suggest that in the punitive damages area, the courts are not heeding Justice Cardozo's admonitory recognition of "the tendency of a principle to expand itself to the limit of its logic." Benjamin N. Cardozo, The Nature of the Judicial Process 51 (1932). In the context of municipal liability, the punitive damages field is one which now goes far beyond "the limit of its logic" as framed originally by early courts and scholars. What was once based on deterrence and punishment has now lost its foundation.
 
 
 96
 In England, the concept of exemplary or punitive damages was first clearly articulated in the case of Wilkes v. Wood, Lofft 1, 18-19, 98 Eng.Rep. 489, 498-99 (C.P.1763). John Wilkes had published a pamphlet, allegedly libelous to the King. The Secretary of State had Wilkes' house searched and seized his property on a nameless general warrant. In an action for trespass, Wilkes argued that "trifling damages would put no stop at all" (id. at 490) to such conduct and asked for "large and exemplary damages." Id. at 498. The court granted a large sum of damages "as a punishment to the guilty, to deter from any such proceeding for the future, and as a proof of the detestation of the jury to the action itself." Id. at 498-99.
 
 
 97
 In the related case of Huckle v. Money, 2 Wils.K.B. 205, 95 Eng.Rep. 768 (C.P.1763), the judge refused to set aside a jury verdict of 300 despite the judge's view that actual damages could have amounted to at most 20. The Lord Chief Justice stated:
 
 
 98
 I think they have done right in giving exemplary damages. To enter a man's house by virtue of a nameless warrant, in order to procure evidence, is worse than the Spanish Inquisition; a law under which no Englishman would wish to live an hour; it was a most daring public attack upon the liberty of the subject.
 
 
 99
 Id. at 769.
 
 
 100
 As it did in England, the purpose of punitive damages today focuses on punishment and deterrence.[1] As the Restatement (Second) of Torts states:
 
 
 101
 Punitive damages are damages, other than compensatory or nominal damages, awarded against a person to punish him for his outrageous conduct and to deter him and others like him from similar conduct in the future.
 
 
 102
 Res (2nd) § 908(1) (1979). According to one respected commentary, punitive or exemplary damages:
 
 
 103
 are given to the plaintiff over and above the full compensation for the injuries, for the purpose of punishing the defendant, of teaching the defendant not to do it again, and of deterring others from following the defendant's example.
 
 
 104
 Prosser and Keeton on the Law of Torts (5th Edition), § 2 at 9 (1984).
 
 
 105
 These purposes of punishment and deterrence are those frequently cited by the Supreme Court. According to the Court, it is important that damage awards do not "exceed an amount that will accomplish society's goals of punishment and deterrence." Pacific Mutual Life Ins. Co. v. Haslip, --- U.S. ----, ----, 111 S.Ct. 1032, 1045, 113 L.Ed.2d 1 (1991) (quoting Green Oil v. Hornsby, 539 So.2d 218, 222 (Ala.1989)). The Supreme Court has termed punitive damages "private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence." Gertz v. Robert Welch, Inc., 418 U.S. 323, 350, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789 (1974); International Brotherhood of Electrical Workers v. Foust, 442 U.S. 42, 48, 99 S.Ct. 2121, 2125, 60 L.Ed.2d 698 (1979); see also Molzof v. U.S., --- U.S. ----, 112 S.Ct. 711, 116 L.Ed.2d 731 (1992) (interpreting punitive damages as used in the Federal Tort Claims Act).
 
 
 106
 In the context of municipal liability, the Supreme Court has most recently spoken on the topic of punitive damages in Newport v. Fact Concerts, Inc., 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). Determining municipalities were not liable for awards of punitive damages under § 1983, the Court surveyed the state of the common law in 1871 with respect to punitive damages and noted:
 
 
 107
 In general, courts viewed punitive damages as contrary to sound public policy, because such awards would burden the very taxpayers and citizens for whose benefit the wrongdoer was being chastised. The courts readily distinguished between liability to compensate for injuries inflicted by a municipality's officers and agents, and vindictive damages appropriate as punishment for the bad-faith conduct of those same officers and agents. Compensation was an obligation properly shared by the municipality itself, whereas punishment properly applied only to the actual wrongdoers. The courts thus protected the public from unjust punishment, and the municipalities from undue fiscal constraints.
 
 
 108
 Newport, 453 U.S. at 263, 101 S.Ct. at 2757-58 (emphasis added). The Court found analogous policies expressed in the course of the legislative debate over § 1983, noting "Congress' opposition to punishing innocent taxpayers and bankrupting local governments." Newport, 453 U.S. at 266, 101 S.Ct. at 2759. The Court noted:
 
 
 109
 Indeed, punitive damages imposed on a municipality are in effect a windfall to a fully compensated plaintiff, and are likely accompanied by an increase in taxes or a reduction in public services for the citizens footing the bill. Neither reason nor justice suggests that such retribution should be visited upon the shoulders of blameless or unknowing taxpayers.
 
 
 110
 Newport, 453 U.S. at 267, 101 S.Ct. at 2760.[2]
 
 
 111
 The Court thus concluded that "the deterrence rationale of § 1983 does not justify making punitive damages available against municipalities." Newport, 453 U.S. at 268, 101 S.Ct. at 2760. The Court did not wish to run the "serious risk of the financial integrity of these governmental entities" that would be entailed by the direct imposition of punitive damages. Newport, 453 U.S. at 270, 101 S.Ct. at 2761.
 
 
 112
 In its reasoning, the Court focused on individual deterrence and doubted that the prospect of large punitive damages awards assessed against the municipalities would in actuality deter municipal officials including policymakers from wrongdoing. Newport, 453 U.S. at 267-69, 101 S.Ct. at 2760. For the Court, the "more effective" means of deterrence was to assess punitive damages against the offending official. As the Court pointed out:
 
 
 113
 it is far from clear that municipal officials, including those at the policymaking level, would be deterred from wrongdoing by the knowledge that large punitive awards could be assessed based on the wealth of their municipality. Indemnification may not be available to the municipality under local law, and even if it were, officials likely will not be able themselves to pay such sizable awards.... The Court previously has found, with respect to such violations, that a damages remedy recoverable against individuals is more effective as a deterrent than the threat of damages against a government employer.
 
 
 114
 Newport, 453 U.S. at 269-270, 101 S.Ct. at 2760, 2761.
 
 
 115
 Newport's principle of individualized deterrence has been affirmed in subsequent decisions. The Supreme Court later noted that "[a] significant part of [Newport ]'s reasoning was that deterrence of constitutional violations would be adequately accomplished by allowing punitive damages awards directly against the responsible individuals." Smith v. Wade, 461 U.S. 30, 36 n. 5, 103 S.Ct. 1625, 1629-30 n. 5, 75 L.Ed.2d 632 (1983).
 
 
 116
 Such a rationale of individualized deterrence poses troubling questions for the principles behind statutory indemnification arrangements.[3] Whereas one of the purposes of punitive damages is punishment, giving a punitive damage award in any amount to a plaintiff where the individual defendant does not pay fails to punish that individual defendant. Taxpayers, not the offenders, are punished. Perhaps even more importantly, the second purpose of punitive damages, deterrence, is also ill-served. Indemnification eliminates the supposed deterrence behind the punitive damages award. Government officials are in essence told that they are if not legally then financially individually immune from the consequences of their constitutional violations.[4] While it may be presumed that municipalities will be prompted to respond to a damages award with preventative policies and procedures, such generalized deterrence is simply too attenuated to warrant ignoring the perverse effects indemnification agreements have on individualized punishment and deterrence.
 
 
 117
 The case at bar demonstrates my concern for the illogic of punitive damages when the municipality, not the employees, becomes the entity totally "footing the bill." Newport, 453 U.S. at 267, 101 S.Ct. at 2760. Although a city would not be directly liable for any punitive damages awards in a § 1983 case, Philadelphia is obligated to indemnify the individual defendants for their punitive damage liability. The legal bases for this indemnification are both a state statute, the Political Subdivision Tort Claims Act, 42 Pa.Cons.Stat.Ann. § 8548 (1982),[5] and a municipal ordinance, The Philadelphia Code § 20-702 (1985).[6] This case thus involves far more than implementation of the original conceptualization of the punitive damages concept. Pragmatically, this case is a hybrid of both some punitive damages rationales and some legislative provisions for indemnification that by their application vitiate the reasoning of the original punitive damages cases.[7] My concerns over the illogic of punitive damages awards are heightened by the substantial awards rendered in this case.[8]
 
 
 118
 With great perception, the district court said:
 
 
 119
 in talking about the amount of punitive damages assessed against each of these individual defendants I am indulging in rank legal fiction. The truth is that the City will actually be paying punitive damages in this case, or more accurately, the taxpayers of the City of Philadelphia will be paying.
 
 
 120
 It is to the question of whether this "legal fiction" should at least be consistently applied that I now turn.
 
 
 121
 B. Should Evidence of the Individual Defendant's Net Economic Worth Be Required for the Imposition of Punitive Damages Awards in the Context of Municipal Liability?
 
 
 122
 The inquiry into the issue of the necessity of evidence of an individual defendant's economic worth for imposition of a punitive damages award is controlled by federal common law. Basista v. Weir, 340 F.2d 74, 86-87 (3d Cir.1965) (citations omitted); Coulter v. Vitale, 882 F.2d 1286, 1289 (7th Cir.1989).
 
 
 123
 While there is no caselaw of the Supreme Court or in the Third Circuit precisely treating this issue, there are several statements of dicta. In Newport, as a corollary to its principle of individualized deterrence, the Court observed that awards against such officials would be based on these officials' own wealth:
 
 
 124
 By allowing juries and courts to assess punitive damages in appropriate circumstances against the offending official, based on his personal financial resources, the statute directly advances the public's interest in preventing repeated constitutional deprivations.
 
 
 125
 Newport, 453 U.S. at 269, 101 S.Ct. at 2761 (emphasis added).
 
 
 126
 In the Third Circuit, one panel has gone further than the mere relevance of economic worth evidence by interpreting Herman v. Hess Oil Virgin Islands Corp., 524 F.2d 767 (3d Cir.1975), to state that wealth of the defendant is a factor which "should be taken into account in assessing punitive damages." Acosta v. Honda Motor Co., 717 F.2d 828, 839 (3d Cir.1983) (emphasis added). In finding that punitive damages could be assessed in the context of products liability, Acosta also termed the wealth of the defendant one factor by which "corporate defendants are protected from excessive punitive damage awards through judicial control both at the district court and appellate levels." Acosta, 717 F.2d at 839 (quoting Neal v. Carey Canadian Mines, 548 F.Supp. 357, 377 (E.D.Pa.1982)) (emphasis added); see also Miller v. Apartments and Homes, Inc., 646 F.2d 101, 111 (3d Cir.1981) (in § 1982 suit, court was "satisfied that the district court's assessment of $25,000 punitive damages against entities receiving between $300,000 and $400,000 per month in gross rentals was not an abuse of discretion").
 
 
 127
 On the other hand, a different panel stated in Bennis v. Gable, 823 F.2d 723, 734 n. 14 (3d Cir.1987):
 
 
 128
 We reject the defendants' contention that evidence of their financial status was a prerequisite to the imposition of punitive damages. Although the wealth of the defendant, together with the size of the compensatory damage award may be relevant to the imposition of punitive damages, it can hardly be said that the defendants' financial status was an element of plaintiffs' cause of action to be proved before punitive damages could be awarded. Indeed, the Restatement (Second) of Torts, § 908(2) (1979), to which the Supreme Court cites in Newport lists wealth as only a factor, which "can" be considered. The defendants here had every opportunity to present evidence of their financial worth and chose not to do so.
 
 
 129
 While this footnote is only dicta, it is nonetheless significant for this court to consider. I do not, however, believe that the Bennis v. Gable dicta controls this case, since it is in conflict with other Third Circuit statements.
 
 
 130
 There are a variety of cases in other circuits[9] and the state courts on this issue. However, there is no consistent thread that runs through each of them and many are only cursory treatments of the question.
 
 
 131
 One decision that presents a thoughtful analysis of the problem is Adams v. Murakami, 54 Cal.3d 105, 284 Cal.Rptr. 318, 813 P.2d 1348 (1991). In this California Supreme Court decision, a jury verdict had resulted in a $750,000 punitive damages award against the defendant doctor. Neither plaintiff nor defendant introduced any evidence at trial of the defendant's financial condition. Reviewing the award, the California court reversed, holding that "an award of punitive damages cannot be sustained on appeal unless the trial record contains meaningful evidence of the defendant's financial condition." Id. 284 Cal.Rptr. at 319, 813 P.2d at 1349.
 
 
 132
 The California Supreme Court's analysis is instructive. Asking first whether evidence of a defendant's financial condition is a prerequisite to an award of punitive damages, the Adams court answered affirmatively, stating that "the key question before the reviewing court ... whether the amount of damages 'exceeds the level necessary to properly punish and deter[ ]' ... cannot be answered in the abstract." Id. at 320, 813 P.2d at 1350. The court noted that the absence of financial condition evidence renders the court unable to consider the effect of the award on the defendant and thus unable to ensure that the purpose of the award--"to deter, not to destroy"--is fulfilled. Id. at 322, 813 P.2d at 1352. The court pointed out that with no evidence in the record, "a reviewing court can only speculate as to whether the award is appropriate or excessive." Id. at 322, 813 P.2d at 1352. Noting that "the principle that a punitive award must be considered in light of the defendant's financial condition is ancient" and quoting the Magna Carta, the court saw "no reason why a modern-day civil defendant should be entitled to less consideration than one was given 800 years ago." Id. at 322-23, 813 P.2d at 1353.[10]
 
 
 133
 At least in the limited context of municipalities liable for punitive damages through indemnification agreements, federal courts should, I believe, adopt a similar principle as the California Supreme Court. We should extend the rationale behind the undisputed principle of federal common law that the wealth of the defendants is an admissible and relevant factor at trial with respect to punitive damages, Newport, 453 U.S. at 269, 269 n. 30, 101 S.Ct. at 2761, 2761 n. 30; Herman v. Hess Oil Virgin Islands Corp., 524 F.2d 767, 772 (3d Cir.1975), to the municipal indemnification agreement cases where only an insistence on the necessity of such evidence will ensure that the purposes of punitive damages are served. Consideration of such evidence at both the trial and appellate levels will ensure punitive damages awards satisfy the goals of punishment and deterrence. Such evidence would ensure that wrongdoers not taxpayers are punished and that likely future offenders are deterred not emboldened.[11]
 
 
 134
 To address the necessary subsequent question, I would hold that, if such evidence is required at trial and upon appellate review, then the burden of production must be placed on the plaintiff. As the Adams v. Murakami court noted, "the very nature of punitive damages" points to the plaintiff having the burden since "[a]n award of punitive damages, though perhaps justified for societal reasons of deterrence, is a boon for the plaintiff." Id. 284 Cal.Rptr. at 327, 813 P.2d at 1357. Moreover, in the light of the realities of trial practice, it will simply be unfair to place this burden on the defendant, subjecting that party to an inference of admitted liability. While this fairness problem could be addressed by bifurcation of the trial into a phase regarding the liability for punitive damages and a phase regarding the calculation of the amount of punitive damages, I would prefer to lessen that strain on the judicial system. Finally, I note that the oft-stated argument that this burden should be placed upon the defendant because the facts regarding defendant's net worth are peculiarly within the control of the defendant has minimum minimum weight at a time when the federal rules governing discovery have been greatly liberalized.
 
 
 135
 I would thus hold that it is necessary for the plaintiff to produce evidence at trial of a defendant's net economic worth to sustain a substantial punitive damages award where municipal indemnification agreements are involved. The plaintiff would have the burden of producing such evidence.
 
 C. The Application to this Case
 
 136
 The facts of the instant case clearly fall within the bounds of the doctrine I would announce today. These punitive damages are substantial and awarded in the context of municipal liability. Most importantly, they are simply not supported by any evidence of the individual defendants' net economic worth. The record in the instant case reveals not even a scintilla of evidence of the financial position of any of the defendants. As the district court wrote: "[T]he evidence is devoid of details as to defendants' financial position. The most that can be gleaned is that they have been government workers for most of their adult lives."
 
 
 137
 I recognize that the present punitive damages awards against Grasso, Stoner, and Gallagher should not stand. However, since the law was unclear on this issue and I believe that plaintiffs' counsel may have been misled by this court's dicta in Bennis v. Gable, 823 F.2d 723, 734 n. 14 (3d Cir.1987), I think that plaintiffs should be given the opportunity in a new trial on the punitive damage issue to establish proof of the defendants' financial net worth.
 
 
 138
 SUR PETITION FOR PANEL REHEARING WITH SUGGESTION FOR REHEARING IN BANC
 
 
 139
 Jan. 21, 1993.
 
 
 140
 Present: SLOVITER, Chief Judge, BECKER, STAPLETON,
 
 
 141
 MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN,
 
 NYGAARD, ALITO, ROTH, LEWIS, Circuit
 
 142
 Judges, and HIGGINBOTHAM,
 
 Senior Circuit
 
 143
 Judge.
 
 
 
 *
 
 
 
 
 144
 The petition for rehearing filed by Appellants, having been submitted to the judges who participated in the decision of this Court and to all the other available circuit judges in active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is DENIED.
 
 
 145
 MANSMANN, Circuit Judge, would have granted rehearing.
 
 
 
 [1]
 The investigations commenced after Chief Inspector Gallagher had assumed command of IAD and the selection of the investigator was done in a departure from the normal selection process, the rotating wheel process. The anonymous letters against Keenan, Gerrard, and Gilbert that initiated the investigations were received on the same day. Evidence was presented that the letter against Keenan and Gerrard and the letter against Gilbert had been typed on the same typewriter. Although names of the suspected authors were provided to IAD and the routine practice is to investigate authorship in such cases, no investigation of the source of anonymous complaints was conducted
 
 
 [2]
 The jury apportioned the damages as follows:
 Compensatory Punitive
Carol Keenan $220,000.00 $600,000.00
Walter Smith $175,000.00 $300,000.00
Ernest Gilbert $175,000.00 $300,000.00
Daniel Rosenstein $ 40,000.00 $300,000.00
Lawrence Gerrard $ 30,000.00 $300,000.00
 The jury assessed punitive damages against each defendant as follows:
 Grasso Tucker Stoner Gallagher
Keenan $320,000.00 $160,000.00 $40,000.00 $80,000.00
Smith $ 20,000.00 $160,000.00 $40,000.00 $80,000.00
Gilbert $ 20,000.00 $160,000.00 $40,000.00 $80,000.00
Rosenstein $ 20,000.00 $160,000.00 $40,000.00 $80,000.00
Gerrard $ 20,000.00 $160,000.00 $40,000.00 $80,000.00
Total $400,000.00 $800,000.00 $200,000.00 $400,000.00
 
 
 [3]
 As we discuss infra, juries cannot impose punitive damages against directly municipalities under 42 U.S.C. § 1983
 
 
 [4]
 After the district court granted the remittitur, the punitive damages awards were as follows:
 Grasso Tucker Stoner Gallagher
Keenan $213,333.33 $106,666.67 $26,666.67 $53,333.33
Smith $ 13,333.33 $106,666.67 $26,666.67 $53,333.33
Gilbert $ 13,333.33 $106,666.67 $26,666.67 $53,333.33
Rosenstein $ 13,333.33 $106,666.67 $26,666.67 $53,333.33
Gerrard $ 13,333.33 $106,666.67 $26,666.67 $53,333.33
 
 
 [5]
 We have considered but do not find it necessary to discuss the defendants' contentions that prejudicial error was committed by the district court in evidentiary rulings, that the district court erred by permitting a jury of ten to deliberate, and that the district court erred in charging the jury with respect to the defenses to the First Amendment and equal protection claims. We find no merit in these contentions
 
 
 [6]
 At trial, defendants had an opportunity to prove by a preponderance of the evidence that the decision to transfer the plaintiffs would have been the same in the absence of the protected conduct. See Laskaris v. Thornburgh, 733 F.2d 260, 264 (3d Cir.1984) (citing Mount Healthy Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977)), cert. denied, 469 U.S. 886, 105 S.Ct. 260, 83 L.Ed.2d 196. The defendants did present evidence that the transfer decisions would have occurred in any case. For instance, Grasso testified that the transfers were based upon his judgment of individuals' work level and willingness to comply with management objectives
 Given our procedural posture, however, we need only to consider whether the plaintiffs presented evidence sufficient to support the verdict in their favor since the jury was free to disbelieve the defendants' evidence on the legitimate reason defense on which defendants bore the burden of production and proof. Even so, the record provides evidence that contradicts the defendants' claims of legitimate reasons.
 
 
 [7]
 As we make clear in our discussion of the free speech and association claims, a reasonable jury could also have found that defendants Inspector Stoner, Chief Inspector Gallagher, and, to some extent, Police Commissioner Tucker each had knowledge of Grasso's practice of sexual discrimination
 
 
 [8]
 We believe this incident sheds light on the entire course of Grasso's treatment of Keenan. We do not base liability on this incident alone and we express no view as to whether this incident, in and of itself, would be sufficient to uphold liability
 
 
 [9]
 Hurst and a vice-president of the FOP, Mike Lotts, then met with Chief Inspector Gallagher later that day. Hurst related the incidents and pressed Keenan's concerns. A couple of days later, after checking with Keenan, Hurst then sent Gallagher a typed version of Keenan's memorandum which included the names of Gerrard, Gilbert, and Rosenstein
 After receiving the typed memorandum, Chief Inspector Gallagher sent Inspector Stoner to speak with Keenan a third time on May 29, 1987. Since May 14, 1987, Stoner had been on the Affirmative Action Board of the Philadelphia Police Department. When Stoner told Keenan that he was speaking to her in his capacity as a representative on this unit, Keenan expressed surprise, having never before heard of its existence. Stoner asked Keenan if she wanted to file a formal complaint. Keenan declined, wishing to handle the matter in house. Inspector Stoner took no further action other than to send Gallagher a memorandum stating that he had interviewed Keenan and that she did not wish to make a formal complaint. Chief Inspector Gallagher took no further action.
 
 
 [10]
 The City alleges that the impact of the judge's many sua sponte witticisms were cumulatively disparaging of the City. In one instance, the trial judge excused the jury saying that the defense was about to give him "the sermon of the day." Indeed, a jury can easily assume that a comment, even given with levity, is indicative of the judge's belief on the merits in the case. Even a later statement made in the instructions that the judge takes no position one way or the other may not be helpful enough to eradicate the impression which the jurors may have obtained over days of trial. Still, on a cold trial record, it is next to impossible to wisely discern whether a trial judge's efforts to lighten up the tension of a trial result in mere harmless banter or in actual disparagement
 
 
 [11]
 In a separate partially dissenting opinion, Judge Higginbotham notes what he describes as the general logic (and illogic) of substantial punitive damages awards when municipalities are indemnifying the defendant and he considers the specific issue of the necessity of evidence of an individual defendant's economic net worth
 
 
 [12]
 Judge Becker concludes that the rule the partial dissent would adopt is at odds with circuit precedent. See Bennis v. Gable, 823 F.2d 723, 734 n. 14 (3d Cir.1987) ("We reject the defendants' contention that evidence of their financial status was a prerequisite to the imposition of punitive damages."). Although Judge Becker acknowledges that at first blush Bennis may be read as inconsistent with our prior decision in Acosta v. Honda Motor Co., Ltd., 717 F.2d 828 (3d Cir.1983), that case construed Virgin Islands law on punitive damages. See id. at 830. However, in Bennis, this court was interpreting the federal common law governing punitive damages awards in section 1983 cases. Therefore, Judge Becker believes Bennis is on point and Acosta is inapposite. Judge Hutchinson does not reach that issue
 
 
 [13]
 Other circuits do not strictly require contemporaneous records. See, e.g., Jean v. Nelson, 863 F.2d 759, 772 (11th Cir.1988), aff'd on other grounds, 496 U.S. 154, 110 S.Ct. 2316, 110 L.Ed.2d 134 (1990) ("contemporaneous time records are not indispensable where there is other reliable evidence to support a claim for attorneys' fees") (EAJA); MacDissi v. Valmont Industries Inc., 856 F.2d 1054, 1061 (8th Cir.1988) ("The question of whether reconstructed records accurately document the time attorneys have spent is best left to the discretion of the court most familiar with the litigation.")
 
 
 [14]
 The first six monthly summaries for Richard A. Sprague were as follows:
 Date Time Description
 10/01/87 15.00 Conferences; Review. (Cumulative for Month.)
 11/01/87 20.00 Conferences; Review; Research. (Cumulative for
 Month.)
 12/01/87 20.00 Conferences; Review. (Cumulative for Month.)
 01/01/88 30.00 Conferences; Review. (Cumulative for Month.)
 02/01/88 50.00 Conferences; Review. (Cumulative for Month.)
 03/01/88 45.00 Arbitration Hearings; Review. (Cumulative for
 Month.)
 
 
 [15]
 At plaintiffs' asserted rate of $200/hour, the total is $126,300, a significant portion of the overall award of counsel fees
 
 
 [16]
 We note in connection with the inclusion of the hours spent on the arbitration hearing that in reviewing the record a double reward question surfaced. Plaintiffs' counsel admit that they were reimbursed by the Fraternal Order of Police in connection with the arbitration hearing. Plaintiffs' Answers to Defendants' Interrogatories Addressed to Plaintiffs' Petition For Award of Attorneys' Fees and Costs at 21. The plaintiffs responded "Yes." when the City requested: "State whether the Fraternal Order of Police, Lodge No. 5 or the Legal Services Trust Fund for the Fraternal Order of Police, Lodge No. 5 Legal Services Plan reimbursed the firm of Sprague, Higgins, Creamer, & Sprague for any fees or costs associated with the arbitration over the grievance of Keenan, Gerrard and Gilbert referred to in Paragraph 8 of the Fee Petition." Id
 On remand, the district court has the discretion to consider whether the double reward compensation is appropriate on the facts of this case. Should the district court determine that double counting has occurred, it may, in its discretion, uphold the fee award against the City, with directions to the plaintiffs to reimburse the FOP.
 
 
 [17]
 All of the Third Circuit attorneys' fees cases granting compensation for delay have been decided on the basis of historical rates. See Blum II, 888 F.2d at 984, n. 4; Institutionalized Juveniles v. Secretary of Public Welfare, 758 F.2d 897, 904 (3d Cir.1985); see also Cerva v. E.B.R. Enterprises Inc., 740 F.Supp. 1099, 1107 (E.D.Pa.1990); Vargas v. Calabrese, 750 F.Supp. 677, 685 (D.N.J.1990), aff'd in relevant part and remanded in part, 949 F.2d 665 (3d Cir.1991)
 
 
 [18]
 The rationale for using current rates is that "[u]sing current market rates to calculate the lodestar figure may counterbalance the delay in payment as well as simplify the task of the district court." Blum II, 888 F.2d at 984 n. 4 (quoting Murray v. Weinberger, 741 F.2d 1423, 1433 (D.C.Cir.1984) (quoted in Institutionalized Juveniles, 758 F.2d at 923 & n. 41 (3d Cir.1985))). There are, however, problems in using the current rates. The current rates may not track the time value of money as accurately as the market rate of interest would. Furthermore, the current rates for any individual attorney may reflect other factors than the passage of time, such as an increase in skill
 
 
 [1]
 Since 1763 and during the doctrine's development in American courts, there has been some debate as to the precise rationale for this category of damages. See generally Note, Exemplary Damages in the Law of Torts, 70 Harv.L.Rev. 517 (1957); L. Schlueter, K. Redden, Punitive Damages § 1 (1989)
 
 
 [2]
 In a footnote, the Court went to note: "It is perhaps possible to imagine an extreme situation where the taxpayers are directly responsible for perpetrating an outrageous abuse of constitutional rights." Newport, 453 U.S. at 267 n. 29, 101 S.Ct. at 2760 n. 29. This scenario is, of course, not brought up by the facts of the instant case
 
 
 [3]
 The Supreme Court only implicitly and with qualifications approved municipal indemnification agreements. Newport, 453 U.S. at 269-70 n. 30, 101 S.Ct. at 2761 n. 30. The Court specifically cited only state statutes that "exclude indemnification for malicious or willful misconduct by the employees." Id
 I do not suggest that Newport nullifies these municipal obligations. See Bell v. Milwaukee, 746 F.2d 1205, 1271 (7th Cir.1984).
 
 
 [4]
 This inherent illogic has been recognized by and acted upon by at least one civil rights plaintiff. In Cornwell v. Riverside, 896 F.2d 398 (9th Cir.1990), cert. denied, 497 U.S. 1026, 110 S.Ct. 3274, 111 L.Ed.2d 784, the plaintiff was awarded $45,000 in a § 1983 action punitive damages award. When the city offered to pay the punitive damages assessed against five of its police officers, the plaintiff refused to accept them. She argued that "there is a federal policy that forbids the payment of punitive damages by a municipality." Id. The court ultimately rejected plaintiff's argument, reasoning that "When the City decides that it is in its best interest to pay, the taxpayers have decided through their representatives that it is to their benefit to help out the officers." Id. at 400. As the district court wryly noted in the instant case: "Unlike Cornwell, here plaintiffs are quite content to take their punitive damage dollars not directly from the personal defendants, but inherently from the City's taxpayers."
 
 
 [5]
 42 Pa.Cons.Stat.Ann. § 8548(a) provides: "Indemnity by local agency generally. When ... it is judicially determined that an act of the employee caused the injury and such act was, or that the employee in good faith reasonably believed that such act was, within the scope of his office or duties, the local agency shall indemnify the employee for payment of any judgment on the suit."
 A recent Pennsylvania Supreme Court decision affirmed that the state law provision requires a municipality to indemnify an employee for "any judgment" rendered against the employee acting within the scope of his duties in a § 1983 action, holding that this included attorney's fees, costs, and expenses as well as compensatory damages. Wiehagen v. North Braddock, 594 A.2d 303 (Pa.1991).
 
 
 [6]
 Section 20-702 provides: "Representation by City. The City Solicitor shall defend and the City of Philadelphia shall indemnify and hold harmless the officers and employees of the City, whether currently employed by the City or not, against and from any and all personal liabilities, actions, causes of action, and any and all claims made against them whatever for acts performed within the scope of their employment."
 
 
 [7]
 The unusual nature of this case did not escape plaintiffs' counsel. In an eloquent summation to the jury, he grabbed the best of both worlds and argued:
 And punitive damages, members of the jury, are beyond compensatory damages, punitive damages are just what it says. It means imposing an additional damage, penalty. It is done to teach someone a lesson. It is done to teach them, don't do it again. And, it is done to have a ringing message to the Grassos and the Stoners and the Gallaghers and the cities and the police departments that discriminate....
 Now, in this case, each of the individual defendants as you will hear from Tucker to Gallagher to Stoner to Grasso, they are not being sued as private citizens, they are being sued in their official capacity, in their positions of employment that they had for the City because the City bears responsibility for what they did. So they are sued in their official capacity.
 Jt.App. at A6419-20 (emphases added).
 
 
 [8]
 The instant case awards a very substantial award of punitive damages, $1,200,000 after remittitur, much more substantial than those awarded by other civil rights cases decided in this Circuit under § 1983
 See Mayberry v. Walters, 862 F.2d 1040, 1042, (3d Cir.1988) (upholding a district court judgment entered after a jury verdict indicated awards of $500 in punitive damages against each of three prison officials after plaintiff was attacked by a fellow prisoner), appeal after remand, 884 F.2d 1384 (1989); Fletcher v. O'Donnell, 867 F.2d 791 (3d Cir.1989) (affirming without discussion of excessiveness a punitive damages award of $750 against a police officer who used excessive force against the plaintiff), cert. denied, 492 U.S. 919, 109 S.Ct. 3244, 106 L.Ed.2d 591; Abraham v. Pekarski, 728 F.2d 167 (3d Cir.1984), cert. denied, 467 U.S. 1242, 104 S.Ct. 3513, 82 L.Ed.2d 822 (affirming without discussion punitive damages awards of $2,000 against each of five individual members of a township's Board of Commissioners after plaintiff was discharged from his position as the township director of roads and public property); Black v. Stephens, 662 F.2d 181, 192 (3d Cir.1981) (a case orally argued before the Supreme Court's decision in Newport v. Fact Concerts, Inc., 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), not finding excessive punitive damages awards of $1,500 against the chief of police and $10,000 against the municipality), cert. denied 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876 (1982); Perez v. Cucci, 725 F.Supp. 209 (D.N.J.1989) (awarding $25,000 in punitive damages to a plaintiff who was demoted from the rank of plainclothes detective to uniformed patrolman because he had openly supported the candidacy of a (defeated) mayoral candidate); Carpenter v. Dizio, 506 F.Supp. 1117 (E.D.Pa.1981), aff'd without op., 673 F.2d 1298 (3d Cir.) (city police officers who had arrested and severely beaten the plaintiff were assessed some portion of a $20,000 punitive damages award); Hild v. Bruner, 496 F.Supp. 93 (D.N.J.1980) (two plaintiffs each awarded punitive damages of $5,000, $5,000, and $3,000 against each of three individual police officers involved in a struggle resulting in injuries to the plaintiffs); Pitts v. Kee, 511 F.Supp. 497 (D.Del.1981) (prison inmate kept in solitary confinement awarded $500 in punitive damages); Schreffler v. Board of Education, 506 F.Supp. 1300 (D.Del.1981) (district court remitted the jury verdict from $77,500 to $7,750 and awarded punitive damages against six defendants when a former high school principal brought suit against the Board of Education for refusal to renew his contract); see also Bennis v. Gable, 823 F.2d 723, 734 (3d Cir.1987) (vacating on other grounds four punitive damages awards, two of $40,000 and two of $100,000, in favor of police officers allegedly demoted for exercise of protected First Amendment activity and noting in dicta that "the amount of punitive damages actually awarded may well have been excessive."); Miller v. Apartments and Homes, Inc., 646 F.2d 101, (3d Cir.1981) (affirming punitive damages of $25,000 under § 1982).
 
 
 [9]
 Some cases support the proposition that evidence of defendant's financial condition is not necessary to serve the purposes of punitive damages and the proposition that if a defendant wishes to have evidence of his financial condition considered, it is his burden to introduce such evidence. Smith v. Lightning Bolt Productions, Inc., 861 F.2d 363, 373 (2nd Cir.1988); Zarcone v. Perry, 572 F.2d 52 (2nd Cir.1978); Fishman v. Clancy, 763 F.2d 485, 490 (1st Cir.1985); Tri-Tron International v. Velto, 525 F.2d 432 (9th Cir.1975); El Ranco, Inc. v. First Nat'l Bank, 406 F.2d 1205, 1218-19 (9th Cir.1968), cert. denied, 396 U.S. 875, 90 S.Ct. 150, 24 L.Ed.2d 133 (1969); Woods-Drake v. Lundy, 667 F.2d 1198, 1203 n. 9 (5th Cir.1982); Ortega v. Kansas City, 659 F.Supp. 1201, 1213-14 (D.Kan.1987), rev'd on other grounds, 875 F.2d 1497 (10th Cir.1989), cert. denied, 493 U.S. 934, 110 S.Ct. 325, 107 L.Ed.2d 315 (1989)
 Other cases support the proposition that evidence of economic worth is necessary to ensure that punitive damages punish and deter. Hollins v. Powell, 773 F.2d 191 (8th Cir.1985), cert. denied, 475 U.S. 1119, 106 S.Ct. 1635, 90 L.Ed.2d 181 (1986); Bredberg v. Long, 778 F.2d 1285, 1290 (8th Cir.1985) ("Punitive-damages awards must not exceed the level necessary properly to punish and deter."); Bankers Life & Cas. Co. v. Kirtley, 307 F.2d 418, 425 (8th Cir.1962) (punitive damages award of $650,000 set aside as excessive in absence of reliable economic worth evidence); see also Estate of Davis v. Hazen, 582 F.Supp. 938, 941 (C.D.Ill.1983) (in a § 1983 and wrongful death suit, raising the issue of the relationship between the size of the award ($525,000) and defendant's financial worth sua sponte "because of the size of the punitive damage award" and deciding to hold a hearing to determine defendant's financial worth "in light of defendant's employment as an information clerk with the Decatur Police Department and, in light of the magnitude of the punitive damage award in this case."); Harris v. Harvey, 605 F.2d 330, 341 (7th Cir.1979), cert. denied, 445 U.S. 938, 100 S.Ct. 1331, 63 L.Ed.2d 772 (1980) ("the trial judge should consider reducing the $200,000 [punitive damages] award if defendant can show financial hardship.")
 
 
 [10]
 The California Supreme Court also noted that the question before it was one of state law but one which had "recently acquired a federal constitutional dimension, which although not dispositive, weighs strongly in favor of requiring evidence of a defendant's financial condition." Adams v. Murakami, 284 Cal.Rptr. at 325, 813 P.2d at 1355. The court stated:
 Haslip ... has made clear a constitutional mandate for meaningful judicial scrutiny of punitive damages awards. This requirement weighs heavily in favor of evidence of a defendant's financial condition. Absent such evidence, a reviewing court cannot make an informed decisions whether the amount of punitive damages is excessive as a matter of law. That commonsense concern it itself sufficient to require such evidence as a matter of state law. Moreover, in light of Haslip, the absence of such evidence raises doubts as to the constitutionality of a punitive damages award.
 Id. at 326, 813 P.2d at 1356 (footnotes and citations omitted). But cf. Adams v. Murakami, 284 Cal.Rptr. at 330, 813 P.2d at 1360 (Kennard, J. concurring) (majority's discussion of Pacific Mutual Ins. Co. v. Haslip is unnecessary).
 
 
 [11]
 I would decide this question as a matter of this court's power to decide federal common law and express no opinion on any constitutional issue relating to punitive damages. Cf. Laughinghouse v. Risser, 786 F.Supp. 920, 927 (D.Kan.1992) (rejecting a constitutional claim based on Adams v. Murakami, 54 Cal.3d 105, 284 Cal.Rptr. 318, 813 P.2d 1348 (1991)). At least one court has stated that the Seventh Amendment prohibits a court applying federal law from using a post-trial review scheme where that court considers evidence which may not have been presented to the jury, such as the Alabama scheme upheld in Haslip. Mattison v. Dallas Carrier Corp., 947 F.2d 95, 107-10 (4th Cir.1991)
 However, I can see no Seventh Amendment restriction upon the conclusion I would reach here both because I would require the jury to consider such evidence and because the court would not consider any new evidence.
 
 
 *
 As to panel rehearing only