Tracy **GARNER** and Dale Garner

v.

Police Officer Lawrence A. **MEOLI**; and Police Officer Gerald M. **McTear.**

No. CIV. A. 96–1351.

United States District Court, E.D. Pennsylvania.

Aug. 31, 1998.

Jeffrey Cooper, Mark E. Gottlieb, Molly Peckman, Mesirov Gelman Jaffe Cramer & Jamieson, Philadelphia, PA, for Plaintiff.

Robert G. Hanna, Jr., John P. Gonzalez, Marshall, Dennehey, Warner, Coleman and Goggin, Philadelphia, PA, for Defendants.

## *ORDER AND MEMORANDUM*

DuBOIS, District Judge.

## *ORDER*

**AND NOW,** to wit, this 31st day of August, 1998, upon consideration of the Omnibus Post–Trial Motion of Defendants Pursuant to Federal Rule of Civil Procedure 50(b); 59(a) and 59(e) (Doc. No. 114, filed April 27, 1998), Supplemental Memorandum of Law in Support of Defendants' Omnibus Post–Trial Motion (Doc. No. 119, filed May 18, 1998), and Plaintiffs' Response to Defendants' Omnibus Post–Trial Motion (Doc. No. 120, filed May 28, 1998), for the reasons set forth in the accompanying Memorandum, **IT IS ORDERED** that defendants' Omnibus Post–Trial Motion of Defendants Pursuant to Federal Rule of Civil Procedure 50(b); 59(a) and 59(e) is **DENIED.**[1]

## *MEMORANDUM*

**1. Background:** This case arises out of plaintiffs' claims that two Tredyffrin Township police officers unlawfully arrested plaintiff Tracy Garner, using excessive force, illegally searched his home and thereafter maliciously prosecuted him, all in violation of 42 U.S.C. § 1983. Plaintiff Dale Garner, Tracy Garner's wife, asserted a claim for loss of consortium.

On April 15, 1998, following a jury trial which commenced on April 6, 1998, the jury returned a verdict: (1) in favor of plaintiff Tracy Garner and against defendant Police Officer Lawrence A. Meoli in the amount of $78,250 in compensatory damages and $500,000 in punitive damages; (2) in favor of plaintiff Tracy Garner and against defendant Police Officer Gerald M. McTear in the amount of $75,000 in compensatory damages and $250,000 in punitive damages; (3) in favor of plaintiff Dale Garner and against defendant Police Officer Lawrence A. Meoli in the amount of $46,500 in compensatory damages; and (4) in favor of plaintiff Dale Garner and against defendant Police Officer Gerald M. McTear in the amount of $46,500 in compensatory damages. The Court entered judgment on the jury verdict on April 15, 1998. Defendants then filed the within Motion.

The facts giving rise to the case are as follows:

---

1. Although defendants have filed what they entitle a single Omnibus Motion, it is, in fact, premised on two different legal theories: the first is defendants' Renewed Motion for Judgment as a Matter of Law or in the Alternative for a New Trial pursuant to Federal Rule of Civil Procedure 50(b) and the second is defendants' Motion for a New Trial or in the Alternative to Alter or Amend Judgment pursuant to Federal Rule of Civil Procedure 59

Plaintiffs, Tracy Garner and Dale Garner, residents of Tredyffrin Township, brought suit against Tredyffrin Township[2] and two Tredyffrin Township police officers. The suit arose out of an incident on June 29, 1994. On that day the Tredyffrin Township 911 operator received a call from one of plaintiff Tracy Garner's neighbors. The neighbor reported that there were loud noises, including screaming and banging, coming from plaintiffs' apartment at 230 Valley Stream Lane, Wayne, Pennsylvania. She also told the operator that she had reported a similar incident in the past. The 911 operator dispatched the defendant police officers—Officers McTear and Meoli—to the scene. There was conflicting evidence presented at trial as to whether the officers were told by the dispatcher that the neighbor had reported a similar incident in the past or whether they were told only that there was a report of a "domestic disturbance" or only a "disturbance."

When the officers arrived at the Garner residence—a second floor condominium apartment in a residential development—they parked their car outside of the complex and proceeded up the steps to the Garner apartment. One officer, Officer Meoli was designated "contact"—the officer who first knocked on the door and interacted with Mr. Garner—and the other, Officer McTear, was "back-up"—serving as protection in case the encounter went awry. Officer McTear was also the senior officer at the scene and was Officer Meoli's supervisor. Officer Meoli testified that when approaching the apartment, he considered the call to be a "domestic disturbance" call and he was concerned that there might be injured people in the apartment.

Officer Meoli knocked on the door and Tracy Garner answered. He was wearing only a pair of pants and dirty work boots. He had recently come home from his work as a landscaper and had not showered or cleaned up. Mr. Garner testified that a few minutes before the police arrived, he had been on the telephone with his wife. When the police arrived, he was sitting on his couch, watching television. When Officer Meoli knocked, Mr. Garner answered the door. Officer Meoli introduced himself and Officer McTear and told Mr. Garner that they were there investigating a report of a disturbance and noises coming from his apartment and asked for permission to look around the apartment. Mr. Garner asked if they were at the right location and, when assured by Officer Meoli that they were, he told the officer that he had been sleeping; he acknowledged at trial he had not been asleep. Mr. Garner described his interaction with the defendant up to this point as "cordial," but the defendants testified that Mr. Garner immediately refused to identify himself and that he became increasingly "agitated" as they pressed him for permission to enter his apartment.

After this point, Mr. Garner's version of events diverges significantly from the defendants'. According to Mr. Garner, he refused consent to entry of his home; he would only allow the police entry if he was shown a warrant. After a further exchange of words, Mr. Garner testified that Officer Meoli simply pushed past him, proceeded down an entry foyer and scanned the interior of the apartment before exiting the apartment. After exiting, Officer Meoli placed himself in front of the threshold of the door—the same position he had been in when Mr. Garner initially opened the door. Mr. Garner attempted to close the door at this point, but could not because Officer Meoli had positioned his foot in the doorway and refused to remove it. Mr. Garner admitted to repeatedly slamming the door on Officer Meoli's foot in an attempt to close the door. He testified that he then stopped trying to close the door and offered to be arrested. Officer Meoli responded by asking to be let into the home a second time; there was another series of attempts to close the door which turned into a shoving match, after which Officer Meoli ended up "falling."

After falling, Officer Meoli told Mr. Garner that he was under arrest. Mr. Garner said he offered his hands, but that he was told to step outside. He did so and was frisked,

**2.** The claims against Tredyffrin Township were dismissed by agreement on the eve of trial after the Township agreed to indemnify the officer defendants.

with his hands on top of his head. Then the officers pushed him up against an outdoor, stucco wall, hitting his head. At the same time, they ordered him to get to the ground; he tried to comply, but could not because of the way he was being held. In the course of pushing Mr. Garner to the ground, the officers repeatedly hit his head against the wall and then against a railing. During this time, Mr. Garner was "screaming" for help.

Once on the ground, Mr. Garner was handcuffed. He then noticed that one of his neighbors had come out; when the neighbor appeared, the officers "backed off," but they would not permit the neighbor to enter Mr. Garner's home in order to get a shirt for Mr. Garner, who was still wearing only pants and work boots. Officer Meoli then entered Mr. Garner's home and conducted another search. He acknowledged that he found no one else in the apartment.

After a "short period of time," an ambulance arrived. While the paramedics were treating Mr. Garner, a third officer—Officer Mutter—arrived at the scene and entered the home to assist in a search. Mr. Garner was thereafter taken to the hospital where his injuries were treated.

Defendants dispute this version of events. According to defendants' testimony, while Officer Meoli was standing at the door "pleading" with Mr. Garner to be allowed into the apartment to take a "short look," he could observe "clutter" and a chair that was "thrown out of whack," raising his suspicions that there had been some kind of fight in the apartment. He very much wanted consent to enter the apartment because he feared someone might have been injured. Officer Meoli continued to speak with Mr. Garner, who was "visibly agitated" and uncooperative; he never attempted to push past Mr. Garner, nor did he enter the apartment. During this time, Mr. Garner attempted to close the door, but it tapped Officer Meoli's foot which was resting on the threshold and would not close. More agitated conversation followed, until Mr. Garner again tried to close the door, this time by slamming it hard, twice in quick succession, on Officer Meoli's foot. Officer Meoli moved away from the door and Mr. Garner followed him out of the home; Mr. Garner then kicked the officer in the shin.

After being kicked, Officer Meoli informed Mr. Garner that he was under arrest; Mr. Garner retreated into the home, and the officer followed him. There was a brief scuffle in the hallway, and Mr. Garner ran out of the apartment to avoid being handcuffed; he began screaming for help. Officer McTear then joined Officer Meoli and together they attempted to get handcuffs on Mr. Garner, who continued resisting. During this time, they were trying to force Mr. Garner onto the ground, and were continually instructing him to get down. In the struggle to handcuff him, all three men stumbled into the stucco wall outside of Mr. Garner's apartment. At this point, Mr. Garner fell to the ground and initially appeared to be unconscious. Officer Meoli testified that although they believed he was only "pretending" to be unconscious— pretending because Officer Meoli could see him opening his eyes from time to time— under those circumstances, it was standard procedure to call for an ambulance and report that Mr. Garner was unconscious.

Mr. Garner was charged by Officer Meoli with aggravated assault, simple assault, resisting arrest or other law enforcement, disorderly conduct and harassment. In their police report, the officers wrote that as they stood in the doorway—before any altercation—they saw a hole in the wall inside Mr. Garner's home and were concerned that it indicated a struggle or fight had taken place. They also testified to that effect at Mr. Garner's preliminary hearing. The officer defendants pursued the charges against Mr. Garner through the preliminary hearing, but following the hearing, and after an investigation, the district attorney's office decided to nol pros the charges against Mr. Garner on June 14, 1995. That decision was based, at least in part, on a report by David Pope, a materials science engineer retained by the district attorney's office, who concluded that the hole in the wall was a "near perfect" match with one of the flashlights carried by the officer defendants on the night of Mr. Garner's arrest.

At trial, plaintiffs' expert, Craig David Clauser, testified, "with a reasonable degree

of engineering certainty," that the hole in the wall was made by a police flashlight of the type carried by defendants. Plaintiffs argued that the defendants purposely made the hole in an effort to manufacture probable cause for a search of the home. Officer Meoli testified that he did not know how the hole had gotten there, that he continued to believe the hole was there before his altercation with Mr. Garner, but that it was possible that while struggling to handcuff Mr. Garner in the hallway of the home, while Mr. Garner was running back out, he bumped Officer McTear up against the wall and the flashlight attached to Officer McTear's belt made the hole.

**2. Federal Rule of Civil Procedure 50(b):** A motion under Rule 50(b) " 'should be granted only if, in viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability. In determining whether the evidence is sufficient to sustain liability, the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version.' " *McDaniels v. Flick,* 59 F.3d 446, 453 (3d Cir.1995), *cert. denied,* 516 U.S. 1146, 116 S.Ct. 1017, 134 L.Ed.2d 97 (1996) (quoting *Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1166 (3d Cir.1993) (citations omitted)). A court may grant a Rule 50(b) motion only when, "without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment." 5A James W. Moore, Federal Practice and Procedure & 50.07[2], at 50–76 (2d ed.) (footnote omitted).

The basis of defendants' Rule 50(b) Motion is their contention that exigent circumstances justified their search of plaintiffs' home as a matter of law. Alternatively, even if the search was unlawful, defendants assert that they were entitled to qualified immunity. The first issue—whether there were exigent circumstances at the time defendants entered plaintiffs' home—was properly submitted to the jury because the facts surrounding the police officers' entry of plaintiffs' home were disputed. *See, e.g., Sharrar v. Felsing,* 128 F.3d 810, 820 (3d Cir.1997) ("The issue of exigent circumstances ... [where there are disputed factual issues] would be one for the jury." (citing *Bodine v. Warwick,* 72 F.3d 393, 399 (3d Cir.1995)). The second issue—the claim of qualified immunity—was withdrawn by defendants at trial.

The defendants contend that, because the defendant officers were responding to a "domestic disturbance" call, they reasonably feared for the safety of themselves or another. A reasonable fear that they or a third person are in "imminent danger" is an exigent circumstance which justifies a warrantless search. *Parkhurst v. Trapp,* 77 F.3d 707, 711 (3d Cir.1996). Under the plaintiffs' version of the facts, however, the jury could have concluded that defendants did not have information that they were responding to a domestic disturbance call, as opposed to a call reporting only a "disturbance," and did not reasonably fear for the safety of themselves or others. Importantly, there was evidence contradicting defendants' assertions that when they arrived a Mr. Garner's residence, they believed they were responding to a domestic disturbance; at best, the evidence conflicted. For instance, on the 911 tapes, the dispatcher spoke with the officer defendants and described only a "disturbance." *See* Plaintiffs' Exhibit 2. The dispatcher also related to the officers that there had been a report of "screaming and banging." Moreover, Officer McTear testified—through reading his prior deposition—that at the time he arrived at Mr. Garner's apartment, he had no reason to believe he was entitled to conduct a search without a warrant. Transcript, April 8, 1998 at 122.

There was also evidence that defendants had just handled a domestic disturbance call quite differently than they had handled the call to Mr. Garner's home: Officer McTear testified that on the same day as the incident giving rise to this lawsuit, he responded to another "domestic disturbance" call. In responding to that call, the police established a "command post" out of sight of the home to which they had been called, questioned neighbors, and, after recovering a rifle from the scene, did not search that home. Transcript, April 8, 1998 at 117–18. In contrast,

when arriving at the Garner residence, the officers pulled up to the parking lot in front of Mr. Garner's home and did not question neighbors. Officer Meoli testified that after Mr. Garner answered the knock, and while speaking with him before the altercation, he did not observe anyone in Mr. Garner's home, did not hear any noises from inside his home and did not observe any bloodstains in his vicinity. *Id.* at 147. Based on this testimony, in combination with other evidence presented at trial, the jury could reasonably conclude that there were no exigent circumstances justifying a warrantless search of plaintiffs' home The Court will not, therefore, disturb the jury's findings.

■ Defendants spend considerable effort arguing that the police are justified in placing a foot in the threshold of a door when speaking to a citizen. In support, they cite *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976), holding that when a suspect answers the door, she exposes herself to public view and is subject to arrest if the officer's have probable cause. Under the "hot pursuit" doctrine, such a suspect may not retreat into her home to thwart an arrest once the police have probable cause for that arrest. *Id.* at 42–43, 96 S.Ct. 2406; *see also Joyce v. Town of Tewksbury*, 112 F.3d 19 (1st Cir.1997) (extending *Santana* and holding that officers who follow a suspect for whom they have an arrest warrant into a home after he answers the door are qualifiedly immune). Based on that case, defendants argued that, as a matter of law, Officer Meoli was not conducting an illegal search merely because he had his foot in the threshold of plaintiffs' door. The Court agreed with defendants on this point and so instructed the jury, as follows:

> In determining whether a search actually occurred in this case, I instruct you that without more a police officer has not intruded upon a home, that is, conducted a search in violation of the Fourth Amendment, when he places his foot on the threshold of a door that has been voluntarily opened. Moreover, an individual who has committed a crime in his doorway may not retreat into his home to thwart or block an otherwise unlawful arrest. How-

ever, unless a police officer has probable cause to make an arrest, or an exigent circumstance exists justifying his entrance into the home, an officer may not prevent a homeowner from closing his door while being questioned by the police.

Transcript, April 14, 1998 at 123.

As is apparent from the above instruction, the issue was not whether defendants had the right to place a foot in plaintiffs' threshold—the Court instructed the jury that they had that right. The only issue was whether the officers had the right to enter the premises—and conduct a search—without a warrant, that is, whether they had exigent circumstances or whether they had probable cause to make an arrest.

Tracy Garner testified that Officer Meoli entered plaintiffs' home before the incident involving the foot in the door, Transcript, April 7, 1998 at 56; if believed, that alone would justify a jury finding that plaintiffs' right to be free from an unlawful search had been violated (assuming, as the Court must in light of the jury verdict and its holding above, the absence of a exigent circumstance). Moreover, in light of the evidence as a whole, the jury could reasonably conclude that the police entry during the altercation with plaintiff Tracy Garner and the search following his arrest were both unlawful. The Court will not, therefore, disturb the jury verdict on this ground and holds that its instruction with respect to the placement of Officer Meoli's foot in the threshold was proper.

■ Defendants also contend that at best the law was unclear with respect to the right of an officer to place his foot in the door of a citizen's home and that the defendant officers were therefore qualifiedly immune for their actions. The Court discusses the qualified immunity defense in detail below, but in the context of the "foot in the door" issue, defendants have miscast the question. There was, as explained, no issue as to whether Officer Meoli was allowed to place his foot in the door: he was and the jury was so instructed. The real question was whether the officer could prevent plaintiff Tracy Garner from closing his door by keeping his foot in the threshold. The Court held that

absent exigent circumstances or consent, without a search warrant, Officer Meoli could not and that it was clearly established law at the time of the arrest that he could not; thus, the questions which were in dispute were whether the officers conducted a warrantless search and if so, whether there were exigent circumstances or consent justifying such a search. Those were the issues submitted to the jury and the jury's verdict was consistent with the evidence. The Court will not disturb the verdict.[3]

■■■ As to the issue of the defendants' qualified immunity, it is well established that qualified immunity is a question of law for the Court and that the issue of what law was "clearly established" at the time of an incident is always for the Court to decide. *See Sharrar*, 128 F.3d at 826–28. However, like the question of the existence of exigent circumstances, where " historical facts material to the [question of the reasonableness of police actions] are in dispute . . . there [will] be an issue for the jury." *Id.* at 828. In accordance with this authority, the Court concluded, at the beginning of the trial, that disputed issues of fact related to qualified

immunity would have to be submitted to the jury.

The Court's initial position on the qualified immunity defense changed during the trial because defendants withdrew that defense.[4] Accordingly, with defendants' agreement, the Court did not charge the jury on the disputed facts involved in the qualified immunity defense. That decision stemmed from the difficulty experienced by the parties and the Court in constructing a charge on qualified immunity; the issues raised by this defense were extremely difficult to present in a practical way for jury consideration. After extensive discussions on the issue, defendants agreed that they would waive their qualified immunity defense in exchange for an instruction that, although defendants had the burden of coming forward with evidence that there were exigent circumstances, the ultimate burden of proof always remained with plaintiffs. This was the instruction the Court intended to read to the jury and defendants' counsel, Mr. Hanna, was satisfied that by reading this instruction, the case could be simplified, without harm to his clients, if defendants waived their defense of qualified immunity, and they did so.

---

3. Defendants arguments suggest that a citizen cannot refuse to speak with, or close his door on, the police when being questioned. There is no support for this proposition. It is true that if the police have a reasonable suspicion they may stop a citizen, and with probable cause, they may arrest a citizen, but lacking probable cause—or an exigency as discussed above—the police cannot force a citizen to be questioned and the cases cited by defendant do not suggest otherwise. *See Santana*, 427 U.S. at 42, 96 S.Ct. 2406 (holding that where police have "probable cause" a suspect may not thwart arrest by retreating into her home); *Joyce*, 112 F.3d at 22–23 (holding that officers were qualifiedly immune where making a doorway arrest where they had an arrest warrant).

The Court notes that there is no law directly addressing the question whether a police officer—absent exigent circumstances or probable cause to arrest—may prevent a citizen from closing his door by keeping his foot on the threshold. However, this situation is analogous to that presented by the question of how long police may detain a suspect short of arrest. *See Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (holding that law enforcement officers may stop and temporarily detain persons short of arrest without violating the Fourth Amendment.) That is, police officers have the right to stop a citizen and question him or her if they have a

reasonable suspicion justifying that stop, just as they have the right to knock on a citizen's door and question him in the threshold of his home. In neither situation, however, may an officer, without consent, indefinitely detain—or indefinitely question—a citizen, unless the initial suspicion develops into probable cause to arrest or exigent circumstances.

During the course of a *Terry*-stop, "the suspect must not be moved or asked to move more than a short distance; physical searches are permitted only to the extent necessary to protect the police officers involved during the encounter; and, *most importantly*, the suspect must be free to leave after a short time and to decline to answer the questions put to him." *Kolender v. Lawson*, 461 U.S. 352, 362, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983) (Brennan, J., concurring) (emphasis added). If he is being questioned in the doorway of his home, the only manner by which a suspect may leave or "walk away" from the encounter, is to close the door or request the police to leave. It would eviscerate the Fourth Amendment to hold that the police can indefinitely detain and question a citizen at the door of his home merely by placing a foot on the threshold.

4. The Court finds it strange that defendants failed to mention in their motion papers that they had withdrawn the qualified immunity defense.

Thus, during a discussion on April 13, 1998, Mr. Hanna stated that "maybe we should drop the request for the qualified immunity charge.... I'm almost inclined to say that the qualified ·immunity charges should not be submitted to the jury in view of the situation as it exists now." Transcript, April 13, 1998 at 114–15. There followed some discussion during which the following exchange occurred:

Mr. Cooper: I think there's some trade offs, your Honor, certainly with respect to the ultimate burden. If Mr. Hanna is willing to withdraw the charge [on qualified immunity], my understanding is that you will charge that the defendants have the burden of proving exigent circumstances but that the plaintiff has the ultimate burden of proving the constitutional violation.

The Court: Well, what I'm going to say is that the defendants have the burden of going forward with the evidence of exigent circumstances. You certainly don't have to do that. They have to offer exigent circumstances.

Mr. Cooper: They have to offer the evidence.

The Court: But the ultimate burden of proof remains with you. You must prove that the search was unreasonable.

Mr. Cooper: I'm willing to accept that in the absence of no [sic] charge on qualified immunity. I think it simplifies the matter, makes it understandable and—

Mr. Hanna: And you're going to put a definition of the clearly established law, as you see it, into the—into your charge?

Mr. Cooper: Well, definition of exigent circumstances.

The Court: Definition of exigent circumstances. There would be no need to charge on clearly established law.

Mr. Hanna: Well, that, in effect, would be the clearly established law.

*Id.* at 117–18. The Court and counsel thereafter discussed the exigent circumstances charge. Mr. Hanna explained that, in light of the Court's charge on exigent circumstances, he "was at a loss as to see what difference between that [qualified immunity charge] would be and what you're really trying to accomplish with the jury on exigent circumstances. So maybe I'm overdoing this. This is like overkill asking for a qualified immunity charge under those conditions." *Id.* at 114. Ultimately, the Court instructed the jury that:

Although certain important exceptions exist, searches that are conducted without first having obtained a warrant for the search from a judicial officer are presumptively invalid.

* * *

Before a police officer may enter a home without a warrant, and there was admittedly no search warrant in this case, there must be an exception to the warrant requirement. And there are two principal exceptions to the warrant requirement that I want to talk to you about.

The first one, that there was consent to the search, and the second, that an exigent or emergency circumstance justified the defendants going forward with the search without first having obtained a warrant. Such an exigent or emergency circumstance exists where police officers reasonably believe that someone in a home is in imminent danger, or where the officers reasonably believe they themselves are in danger. In other words a warrantless intrusion into a home may be justified by the risk of danger to the police or to other persons inside or outside the dwelling.

It is the defendants' burden to come forward with evidence that they acted within an exception to the warrant requirement. That is, the defendants bear the burden of producing evidence that plaintiff, Tracy Garner, consented to a search, or that exigent circumstances existed and justified a warrantless entry of plaintiffs' home.

You must keep in mind, however, that the ultimate burden of proving by a preponderance of the evidence, that the defendants' actions were unreasonable rests with the plaintiffs.

In other words, defendants must produce evidence either of consent or exigent or emergency circumstance, but plaintiffs must still prove that defendants acted unreasonab[ly].

Transcript, April 14, 1998 at 120–22. The parties did not object to this charge and, before instructing the jury as stated, the Court confirmed with Mr. Hanna that in exchange for reading the above charge, defendants would drop their qualified immunity defense. Mr. Hanna agreed:

> The Court:—and Mr. Cooper agreed with that charge, and you agreed that if that was the way that I was going to instruct the jury, you would drop the request for a charge on qualifying [sic] immunity. Is that correct?
>
> Mr. Hanna: That is correct.

Transcript, April 14, 1998 at 8–9.

In order to proceed with the qualified immunity defense it was necessary to submit disputed factual issues relating to that defense to the jury. By agreeing to drop the request for a charge on qualified immunity, defendants waived their right to rely on that defense. Accordingly, the Court will not address defendants' qualified immunity defense at this stage of the proceedings.

**3. Federal Rule of Civil Procedure 59:** Under Federal Rule of Civil Procedure 59, the Court may grant a new trial if "the verdict is contrary to the great weight of the evidence or errors at trial produce a result inconsistent with substantial justice." *Sandrow v. United States,* 832 F.Supp. 918, 918 (E.D.Pa.1993) (citing *Roebuck v. Drexel University,* 852 F.2d 715, 735–36 (3d Cir. 1988)). A new trial should only be granted, however, "where a miscarriage of justice would result if the verdict were to stand." *Olefins Trading, Inc. v. Han Yang Chemical Corp.,* 9 F.3d 282, 289 (3d Cir.1993).

**a. Failure to Grant Judgment as Matter of Law With Respect to Illegal Search Claims:** Defendants contend that the Court erred in failing to grant judgment as a matter of law in favor of defendants on the illegal search claim and that, as a result, even if they are not entitled to judgment as a matter of law, they are entitled to a new trial. That argument is premised on defendants' position that the evidence produced by plaintiff was insufficient as a matter of law to support plaintiffs' claim that the officers illegally entered and searched plaintiffs' home. As the

Court explained above, however, there was sufficient evidence adduced at trial that defendants entered plaintiffs' home absent exigent circumstances and without consent. At trial, conflicting versions of the events giving rise to this lawsuit were presented to the jury. Where there are "disputed factual issues"—as in this case—the question of the legality of a search is properly submitted to the jury. *Sharrar,* 128 F.3d at 820. It was the jury's place to weigh the credibility of witnesses and determine the facts. The jury performed its function, and it cannot be said that a "miscarriage of justice would result if the verdict were to stand."

**b. Failure to Grant Defendant Officers' Qualified Immunity Claim with Respect to the Alleged Illegal Search:** Although defendants argue at length that a police officer is justified in placing his foot on the threshold of on open doorway, they contend that even if an officer is not so justified, the law is at best unclear and therefore would not have been "clearly established" at the time of the incident. As a result, defendants contend that they were qualifiedly immune with respect to their search. The Court has addressed this issue above in the context of defendants' Renewed Motion under Federal Rule of Civil Procedure 50. *See, supra,* pages 385–86. There is no need to re-examine the issue in the context of the Rule 59 Motion.

**c. Failure to Admit Evidence of Tracy Garner's Prior Incidents of Domestic Abuse:** Defendants contend that the Court erred when it ruled that evidence of "prior incidents" between Tracy Garner and the police were inadmissible. The Court wrote on this question by Order dated February 17, 1998. To the extent that defendants renew their previous motion, the Court rests on its prior decision.

The Court also ruled on this question at trial when defendants sought to introduce evidence of plaintiff Tracy Garner's prior arrest. The defendants argued at trial—and argue in their Motion—that a prior arrest on February 10, 1988 was relevant and admissible for the purposes of showing that plaintiff Tracy Garner did not suffer damage to his reputation when he was arrested in front of his neighbors since he had suffered a similar

embarrassment in the past. Defendants also argue that the evidence should have been admissible to rebut plaintiffs' good character evidence.

In addition, defendants contend that other incidents involving the dispatch of police—but no arrest—to Tracy Garner's residence are relevant and should have been admitted. The other incidents were: (1) April 15, 1991—an officer responded to an anonymous call of a disturbance and spoke with Mr. Garner briefly before leaving the scene without taking any action; (2) September 14, 1992—officers responded to a disturbance in which Mr. Garner had reportedly changed the locks on his doors, preventing the woman he had been living with (before his marriage) from retrieving her belongings. The woman was referred to a District Justice for relief. The Court ruled at trial that to the extent those incidents might be considered probative, their prejudicial effect substantially outweighed their probative value under Federal Rule of Evidence 403. *See* Transcript, April 10, 1998 at 7.

 With respect to the February 10, 1988 incident, defendants proffered no evidence at trial that plaintiff was seen by his neighbors at the time of that arrest, almost six years before the incident giving rise to this case. Thus its relevance to this case with respect to Tracy Garner's public humiliation and reputation is tenuous at best. Moreover, to the extent that the incident might be considered relevant to plaintiff Tracy Garner's emotional damages, the Court concluded at trial, and has not changed its mind, that the probative value of such evidence was substantially outweighed by the danger of unfair prejudice. *See* Fed.R.Evid. 403; *see also* Transcript, April 10, 1998 at 12–13.[5]

 Similarly, the Court rejects defendants' argument that the prior incidents are probative of plaintiff Tracy Garner's motives or bias toward the police. First, there

was only one prior incident which apparently involved an arrest of Mr. Garner by the police—the February 10, 1988 incident referred to above—and the Court concludes that that alone was not sufficient to demonstrate any bias on the part of plaintiff. With respect to the issue of whether the "prior incidents" should have been admitted for the purpose of rebutting plaintiff's character evidence, Federal Rule of Evidence 405 does authorize the admission of reputation or opinion evidence as to "the trait or character of a person" where such trait or character evidence is otherwise admissible. Defendants had the option under Rule 405 was to cross examine plaintiff's character witness; under the rule, they could have inquired into "relevant specific instances of that person's conduct," Fed.R.Evid. 405(a), but they chose not to do so. More importantly the Court concludes that the probative value of "the prior incidents" was substantially outweighed by the danger of unfair prejudice, Fed. R.Evid. 403.

**d. Failure to Instruct Jury as Defendant Requested:** Defendants move for a new trial on the ground that the Court erred by failing to instruct the jury on defendants points for charge 1, 3, 10, 11, 12, 13, 19, 21, 23, 25, 26, 27, 28, and 37. As a threshold matter, defendants were required to preserve any objections to the jury charge for purposes of appeal by objecting after the charge was read by the Court. *See* Transcript, April 13, 1998 at 10. At that time, defendants objected to the Court's failure to read their Points for Charge 3, 10, 11, 12, 19, and 21. *See* Transcript, April 14, 1998 at 147–50. The Court will briefly examine those points in turn.

 **Point 3:** Defendants requested that the Court charge that only Officer Meoli instituted criminal proceedings against plaintiff Tracy Garner and that "[t]his theory of liability applies only to Defendant Meoli." The result of such a charge would be to shield Officer McTear, the supervising offi-

---

5. In their Memorandum of Law Regarding the Admissibility of Prior Incidents (attached a part of Document No. 68, filed Jan. 30, 1998), defendants contended that they could show he was seen being handcuffed and arrested by "at least" on other neighbor during the 1988 incident. De-

fendants never told the Court how they intended to prove this proffer. However, even if they could have proven Mr. Garner had been seen being arrested in 1988, the Court properly ruled the evidence inadmissible pursuant to Federal Rule of Evidence 403.

cer, from liability on plaintiff's malicious prosecution charge. It is well settled, however, that a supervising officer can be liable for his failure to intervene to prevent a constitutional violation. *See, e.g., Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994) ("It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.") Because Officer McTear—as Officer Meoli's supervisor—was not lawfully shielded from liability, the Court concludes that its decision not to instruct the jury as defendants requested in Point 3 was correct.

■ **Point 10:** Defendants requested that the jury be charged as to the difference between proving guilt at a criminal trial, and having probable cause to effect an arrest. The Court charged the jury with respect to probable cause, instructing them that:

> a person may not be arrested or imprisoned without probable cause. This means that a police officer must have information that would lead a reasonable person who possesses the same official expertise as the officer to conclude that the person being arrested and imprisoned has committed, or is about to commit, a crime, whether in the police officer's presence or otherwise. A police officer, in making an arrest, cannot rely solely on the statements of another officer for probable cause unless the officer who made the statements himself had probable cause to make the arrest. That is, either the arresting officer, or the officer conveying information to the arresting officer, must have personal knowledge of facts and circumstances which amount to probable cause before an arrest can be made.

Transcript, April 13, 1998 at 117–18. This instruction (modeled on Sand, *Modern Federal Jury Instructions,* (8/94) Instruction 87–74A and *Rogers v. Powell,* 120 F.3d 446, 452–53 (3d Cir.1997)) adequately described the law of probable cause and there was no need to add defendants' requested instruction.

■ **Point 11:** Defendants requested an instruction that "the presence or absence of a hole in Mr. Garner's wall is not an element in

any of the charges that were brought against Mr. Garner." The Court informed counsel at trial that this was an appropriate subject for argument, but not for the charge. *See* Transcript, April 10, 1998 at 66. Counsel argued this point in his closing. It was unnecessary for the Court to instruct the jury as defendants requested.

**Point 12:** Defendants asked that the Court charge the jury that "[t]he issue for you to consider is not whether probable cause existed, but whether there was arguable probable cause." As the Court described above, its instruction on probable cause appropriately covered that issue and it therefore denied defendants' request with respect to their Point 12.

**Point 19:** Defendants asked that the Court read the following instruction: "Mr. Garner has failed to meet his burden of proof by showing that a reasonable police officer could not have believed that exigent circumstances existed to enter Mr. Garner's apartment." As the Court has previously explained, the issue of whether or not an exigency existed was properly submitted to the jury and defendants' request with respect to this charge was therefore properly denied.

■ **Point 21:** The defendants requested that the Court read the text of 18 Pa.C.S.A. 508 (defining the proper use of force in law enforcement). The Court denied this request on the basis that the instruction was covered in the Court's charge with respect to reasonable force. *See* Transcript, April 10, 1998 at 66. The Court charged that:

> To determine whether the acts caused the plaintiff Tracy Garner to suffer the loss of a federal right, you must determine whether the amount of force used to effect the arrest was that which a reasonable officer would have employed in effecting the arrest under similar circumstances. In making this determination, you may take into account the reason for the arrest, whether plaintiff Tracy Garner posed an immediate threat to the safety of the defendants or others, and whether the plaintiff Tracy Garner actively resisted arrest or attempted to evade arrest by flight. Keep in mind that reasonableness must be judged from

the perspective of a reasonable officer on the scene rather then with the 20/20 vision of hindsight. However, you do not have to determine whether the defendants had less intrusive alternatives available for the defendants need only to have acted within that range of conduct identified as reasonable. If you find that the amount of force used was greater than a reasonable person would have employed, the plaintiffs will have established the claim of loss of this federal right.

This charge was modeled on language in Sand, *Modern Federal Jury Instructions*, (8/94) Instruction 87–74C and *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); it appropriately set forth the law on the issue of excessive force.

**Remaining Points:** Because defendants failed to preserve their objections to the refusal of the Court to read their Points 1, 13, 23, 25, 26, 27, 28, and 37, the Court will not discuss those requested charges in detail. Nonetheless, it will briefly examine its rulings on those points.

The Court declined to instruct as defendants requested in Point 1—seeking a directed verdict in favor of defendants—for the same reasons it denied defendants Motion for Judgment as a Matter of Law and is denying the within Motion. The Court denied defendants' requested instruction as to Point 13— "If you should conclude that Officer Meoli reasonably, but mistakenly, concluded that probable cause was present, then you must find in his favor"—on the basis that it was argument. *See* Transcript, April 10, 1998 at 66. While the requested point accurately reflects the law with respect to the grant or denial of qualified immunity, as already set forth, defendants waived that defense. *See Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ("We have recognized that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable.... The same is true of their conclusions regarding exigent circumstances....

[In the context of qualified immunity] [t]he relevant question ... is the objective (albeit fact-specific) question whether a reasonable officer could have believed [the officers'] warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed.") The Court sees no reason to reconsider its decision. Likewise, defendants Point 37 related to qualified immunity, and the Court will not reconsider that issue in light of defendants' decision to drop that defense at trial. Defendants' requested Points 23, 25, 26, 27 and 28 all relate to the use of excessive force. The Court's charge on this subject was adequate.

**4. Request for Remittitur of Punitive Damages:**

Punitive damages in 1983 cases are available where the defendants have acted with a 'reckless or callous disregard of, or indifference to, the rights and safety of others.' *Bennis v. Gable*, 823 F.2d 723, 734 (3d Cir.1987) (quoting *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983)). However, 'punitive damages in general represent a limited remedy, to be reserved for special circumstances.' *Savarese v. Agriss*, 883 F.2d 1194, 1205 (3d Cir.1989) (citing *Cochetti v. Desmond*, 572 F.2d 102, 105–06 (3d Cir.1978)). '[D]espite its utility as a deterrent, the punitive damage remedy must be reserved, we think, for cases in which the defendant's conduct amounts to something more than a bare violation justifying compensatory damages or injunctive relief.' *Cochetti [v. Desmond*, 572 F.2d 102, 106 (3d Cir.1978)].

*Keenan v. City of Philadelphia*, 983 F.2d 459, 469–70 (3d Cir.1993). "[W]here the verdict is so large as to shock the conscience of the court ... [the court may] order[ ] plaintiff to remit the portion of the verdict in excess of the maximum amount supportable by the evidence or, if the remittitur [is] refused, to submit to a new trial." *Kazan v. Wolinski*, 721 F.2d 911, 914 (3d Cir.1983) (citing *Perzeproski v. American President Lines, Ltd.*, 319 F.Supp. 1329, 1330 (E.D.Pa. 1970)). However, before ordering such remittitur, the court must conclude that verdict was " 'so grossly excessive as to shock the judicial conscience.' " *Keenan*, 983 F.2d at

472 (quoting *Gumbs v. Pueblo Int'l Inc.*, 823 F.2d 768, 771 (3d Cir.1987)).

 In this case, there was ample evidence from which the jury could conclude that defendants' behavior was "reckless or callous." The jury's verdict reflects a finding, based on the evidence, that defendants used excessive force, pursued criminal charges without probable cause, and fabricated evidence. In combination with other evidence presented at trial, the Court cannot say that the jury improperly awarded punitive damages, nor can the Court say that those damages "shock its conscience."

The punitive damages in this case are approximately three times the compensatory damages, and that is not so "grossly excessive" as to justifies a remittitur. *See BMW of North America, Inc. v. Gore*, 517 U.S. 559, 568, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) ("Only when an award can fairly be categorized as 'grossly excessive' in relation to [the state's interest in punishment and deterrence] does it enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment.")

The Court also rejects defendants argument, based on Judge Higginbotham's dissent in *Keenan, supra*, that a prerequisite to the awarding of punitive damages is evidence of defendants' net worth and that the burden for producing such evidence must be carried by plaintiffs. *Keenan*, 983 F.2d at 483–84 (Higginbotham, J., dissenting in part). First, defendants did not object to the punitive damages instruction and never raised this issue at trial and have therefore waived the argument. *See id.* at 471. Moreover, the Court agrees with Judge Becker's dicta—the majority did not reach the issue because they held it had been waived—in *Keenan. See id.* at 471 n. 12 (writing that "the rule [Judge Higginbotham] would adopt is at odds with circuit precedent" and citing *Bennis v. Gable*, 823 F.2d 723, 734 n. 14 (3d Cir.1987) in which the circuit wrote that "[w]e reject the defendants' contention that evidence of their financial status was a prerequisite to the imposition of punitive damages."). Defendants had the opportunity to submit evidence of their financial condition and chose not to do so. The Court will not order a remittitur because defendants now second-guess that decision.

## 5. Conclusion

For the foregoing reasons, the Court has denied defendants' Motion.